1                UNITED STATES DISTRICT COURT

2                     DISTRICT OF OREGON

3                     PORTLAND DIVISION

4

5   JENNY HEALY,                    )
                                    )
6              Plaintiff,           )    No. 03:13-cv-01435-HU
                                    )
7   vs.                             )
                                    )
8   CAROLYN W. COLVIN,              )    **FINDINGS & RECOMMENDATIONS**
    Commissioner of Social Security,)
9                                   )
               Defendant.           )
10

11   _____

12

13   James S. Coon
    Swanson, Thomas, Coon & Newton
14   The Thomas Mann Building
    820 SW 2nd Avenue, Suite 200
15   Portland, OR 97204

16        Attorney for Plaintiff

17

18   S. Amanda Marshall
    United States Attorney
19   Ronald K. Silver
    Assistant United States Attorney
20   1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
21

22   David Morado
    Regional Chief Counsel, Region X, Seattle
23   Lisa Goldoftas
    Special Assistant United States Attorney
24   Office of the General Counsel
    Social Security Administration
25   701 Fifth Avenue, Suite 2900 M/S 221A
    Seattle, WA  98104-7075
26

27        Attorneys for Defendant

28

    1 - FINDINGS & RECOMMENDATIONS

HUBEL, United States Magistrate Judge:

The plaintiff Jenny Healy (formerly known as Jenny Rae Sunderland) seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq*. Healy argues the Administrative Law Judge ("ALJ") erred in rejecting the opinions of her treating psychologist, and the testimony of Healy and her husband. *See* Dkt. ##12 & 14.

## I. PROCEDURAL BACKGROUND

Healy protectively filed her application for DI benefits on November 2, 2009, a few days before her 29th birthday, claiming disability since July 1, 2007. (A.R. 20[1]; 156-57) Healy claims disability due to "Ulcerative colitis, Borderline Personality Dis-order, Severe Chronic Depression, Sphincter of Oddi Dysfunction[2], Migraine and Tension Headaches, Anxiety, [and] PTSD." (A.R. 177)

---

[1]The administrative record ("A.R.") was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the A.R. contain at least three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-3, Page 21 of 86) and a Page ID#; and a page number located near the upper right of the page, representing the numbering inserted by the Agency. Some pages also contain a page number inserted by the office supplying the records. Citations herein to "A.R." refer to the agency numbering near the lower right corner of each page.

[2]The sphincter of Oddi allows bile from the liver and pan-creatic juice from the pancreas to flow into the small intestine to help with digestion. In Sphincter of Oddi Dysfunction, the sphincter does not open when it should, causing a backup of digestive juices, which may result in severe abdominal pain. *See* http://my.clevelandclinic.org/disorders/gastrointestinal_tract_di sorders/hic-sphincter-of-oddi-dysfunction.aspx (visited 8/6/14).

2 - FINDINGS & RECOMMENDATIONS

She claims her pain from these conditions make it "very difficult to be in a work environment," and she is "limited in a professional office setting." (A.R. 178)

Healy's application was denied initially and on reconsideration. (A.R. 86-87, 97-101, 103-06) Healy requested a hearing, and a hearing was held on October 31, 2011, before an ALJ. Healy was represented by an attorney at the hearing. Witnesses at the hearing included Healy, her husband, and a Vocational Expert ("VE"). (A.R. 38-85) On November 9, 2011, the ALJ issued his decision, denying Healy's application for benefits. (A.R. 17-32) Healy appealed the ALJ's decision, and on July 17, 2013, the Appeals Council denied her request for review (A.R. 1-5), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Healy filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying her application for DI benefits. Dkt. #1. The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. *FACTUAL BACKGROUND*

### A. *Summary of the Medical Evidence*

On October 3, 2006, Healy saw psychiatrist Bowen S. Parsons, M.D. for "severe depression." (A.R. 759) Healy reported symptoms including suicidal thoughts with no specific plan, a great deal of anxiety, feeling depressed, and also being discouraged by her ulcerative colitis. She was seeing a therapist regularly, and was scheduled to begin a day treatment program at a local hospital the

3 - FINDINGS & RECOMMENDATIONS

following day.   Dr. Parsons prescribed a trial of Effexor, titrating up to 150 mg. each morning; participation in the day treatment program; continued sessions with her therapist; and followup with the doctor in three weeks.  (*Id.*)

On October 4, 2006, Healy saw psychiatrist Michael B. Willet, M.D. for a psychiatric evaluation, for purposes of entering a Partial Hospital Program on referral from her outpatient therapist. (A.R. 779-80; *see also* A.R. 895-98)  Dr. Willet found that Healy represented "a moderate risk for suicide," due to factors including "the level of her dysphoria, periodic alcohol abuse, her loss of physical health, living alone, being unmarried, and having no children of her own." (A.R. 780)   He indicated Healy was an appropriate candidate for treatment in the program, noting Healy was "showing severe impairments in multiple areas of her daily life, due to severe to disabling psychiatric symptoms." (*Id.*)  He listed Healy's diagnoses as "Major Depressive Disorder, recurrent, severe, without psychotic features"; "Binge Alcohol Abuse"; and "Borderline Personality Disorder.  He estimated Healy's current GAF at 45.[3] The doctor increased Healy's Effexor dosage.  (*Id.*)

When Healy next saw Dr. Parsons, on October 24, 2006, she was feeling slightly better.   The doctor noted that Dr. Willet, a

---

[3]"A GAF score is a rough estimate of an individual's psycho-logical, social, and occupational functioning used to reflect the individual's need for treatment. *Diagnostic and Statistical Manual of Mental Disorders* ["*DSM*"] 20 (3rd ed. rev. 1987)." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).  "[A] GAF score between 41 and 50 suggests 'serious symptoms,'" such as "'suicidal ideation, severe obsessional rituals, frequent shoplifting,' or 'any serious impairment in social, occupational, or school functioning[.]'" *Skelton v. Comm'r*, slip op., 2014 WL 4162536, at *10 (D. Or. Aug. 18, 2014) (Hernandez, J.) (quoting the *DSM* (4th ed. 2000) at 34).

4 - FINDINGS & RECOMMENDATIONS

psychiatrist in the day treatment program, had suggested Healy might have an additional diagnosis of borderline personality disorder. Dr. Parsons increased Healy's Effexor dosage to 225 mg. each morning. He prescribed Ambien for insomnia, and added the tricyclic antidepressant trazadone 50 mg. each evening. (*Id.*) On November 21, 2006, Dr. Parsons reduced the Effexor dosage back to 150 mg. per day because Healy was experiencing headaches from the drug. (A.R. 760) Healy's depression increased over the next month, and on December 18, 2006, Dr. Parsons again increased the dosage to 225 mg. per day. When he saw Healy again on February 13, 2007, she remained "depressed and very irritable." He switched her from Effexor to Cymbalta. (*Id.*)

On July 27, 2007, Healy saw gastroenterologist R. William Bennetts, M.D. for a complaint of abdominal pain. Healy indicated she had been diagnosed with ulcerative colitis in 2001, after her first flare of the disease in 1999. Her symptoms included bloody diarrhea with urgency and pain. Currently, she was having up to six bowel movements per day, and significant epigastric pain, decreased appetite, and general malaise. Dr. Bennetts noted Healy had returned to work and independent living recently, and he opined her epigastric pain likely was functional. He planned to obtain records of Healy's past workups, which included CT, esophagogastro-duodenoscopy (EGD), and colonoscopy. He encouraged Healy to engage in "physical and social activities," and to "reconnect with support groups." (A.R. 732)

Healy saw Dr. Parsons on August 3, 2007. Healy's gall bladder had been removed recently, but she continued to have abdominal pain, despite having normal test results after the surgery. Healy

5 - FINDINGS & RECOMMENDATIONS

1   was frustrated and irritable about this.  Notes indicate Healy had
2   returned to work in a lawyer's office.  The doctor prescribed
3   Seroquel 50 mg. twice daily, and increased the Cymbalta to 120 mg.
4   each morning.  (A.R. 760)  When Healy saw Dr. Parsons on August 30,
5   2007, she was still experiencing abdominal pain.  She had "tapered
6   rapidly off vicodin," and was experiencing some withdrawal
7   symptoms.  She also complained of insomnia.  Dr. Parsons directed
8   Healy to taper off Cymbalta, and start Wellbutrin (bupropion) 150
9   mg. twice daily.  He refilled her Ambien.  Healy's diagnoses were
10  listed as "major depression, PTSD, borderline personality dis-
11  order."  (*Id.*)

12      Healy saw Dr. Parsons on November 7, 2007.  She was "very
13  depressed," as she had lost her job, and she had quit taking
14  Seroquel due to "cost and weight gain."  (*Id.*)  Healy was doing
15  EMDR therapy[4] with "her father's therapist," but she was not seeing
16  much benefit from the treatment.  She continued to experience
17  "bouts of indeterminate abdominal pain."  (*Id.*)

18      Healy saw Christopher R. Eilersen, M.D. on November 15, 2007,
19  for followup of pain in the middle of her abdomen.  Notes indicate
20  the pain had started "months ago."  (A.R. 340)  Healy described the
21  pain as mild to moderate, of intermittent duration, and accompanied
22  by intermittent bouts of bloating and constipation.  The pain was

23

24      [4]Eye Movement Desensitization and Reprocessing therapy (EMDR)
25  is a recognized form of psychotherapy used in the treatment of
    trauma and post-traumatic stress disorder (PTSD).  *See, e.g.*, Aetna
    Clinical Policy Bulletin 0583, effective 11/16/2001, available at
26  http://www.aetna.com/cpb/medical/data/500_599/0583.html (visited
    12/04/2014) ("noting the company considers EMDR therapy "medically
27  necessary" for the treatment of PTSD; American Psychiatric Associ-
    ation Practice Guideline for the Treatment of Patients with Acute
28  Stress Disorder and Post-traumatic Stress Disorder (2004).

6 - FINDINGS & RECOMMENDATIONS

"aggravated by nothing and relieved by nothing." (*Id.*) The doctor indicated Healy's symptoms "sound[] like IBS." (A.R. 341) He directed Healy to increase her fiber intake. He ordered lab tests, and prescribed Prevacid and dicyclomine, as needed. (*Id.*)

Healy saw Dr. Parsons on December 10, 2007. She continued to feel very depressed, and had felt suicidal during her last counseling appointment. The doctor opined Healy might be experiencing some withdrawal symptoms from going off the Cymbalta. He restarted Cymbalta at 60 mg. daily, to increase to 90 mg. when Healy got on a patient assistance program. He directed Healy to continue taking Xanax and Ambien as needed, and taper off the bupropion. (A.R. 760) Healy saw Dr. Parsons for followup on January 10, 2008. She continued to have suicidal thoughts with no plan. She was teaching skiing to children at the Mt. Hood ski school, which she enjoyed. She had been unsuccessful finding a job, and was considering returning to school to study nursing. The doctor increased Healy's Cymbalta dosage to 90 mg. daily. (A.R. 760-61)

On February 7, 2008, Healy saw Dr. Parsons for followup. She was doing somewhat better, but was having nightmares. She still was considering returning to school to study nursing. She was working part-time at a coffee shop, while she worked with an employment agency to try to find a paralegal job. (A.R. 761)

Healy saw Mario Seyer, D.O. on February 29, 2008, for a flare-up of colitis, with diarrhea, nausea, and cramping. Healy's pain was present only on her left side. She was still working as a part-time ski instructor, and she indicated her symptoms had begun a week earlier, "after several days of skiing." (A.R. 344) When

7 - FINDINGS & RECOMMENDATIONS

the pain started, she had a fever and sweats, and the pain was more diffuse.  The fever and sweats had subsided, and the pain had localized in her left ribs and flank.  X-rays were negative for fracture, but showed Healy had "copious amounts of stool."  (*Id.*)  The doctor prescribed Zanaflex, a muscle relaxer, 4 mg. twice daily for muscle pain; and Tramadol Hydrochloride 50 mg., one to two tablets every six hours as needed for pain.  Healy also was directed to use Miralax for her bowel symptoms.  (*Id.*)

Healy saw Dr. Parsons on March 28, 2008, complaining of upsets with family matters.  Her medications remained unchanged.  At her next appointment, on April 29, 2008, she reported feeling much better.  She had done well at a three-month temp job in a law office, and was preparing to leave for a summer job at a fishing resort in Alaska.  (A.R. 761)

Healy saw Dr. Eilersen on May 5, 2008, for, among other things, a flare of ulcerative colitis that had been ongoing for three weeks.  Notes indicate Healy's ulcerative colitis began in 2001.  Healy described her symptoms as "cramping pain and bloody stool," of intermittent duration.  (A.R. 246)  The doctor continued Healy on Miralax, Tramadol, and Zanaflex.  He also prescribed a 40-day prednisone taper.  (A.R. 347)

In June 2008, Healy saw Graham Chelius, M.D. at Sitka Community Hospital in Sitka, Alaska, for complaints of intense, persistent abdominal pain; rectal pain; and rectal bleeding; all of which had begun in late April.[5]  (A.R. 287, 315)  Dr. Chelius prescribed Carafate, Omeprazole, and Percocet (*see* A.R. 315-16),

---

[5]Healy's home was in Aloha, Oregon, but she was in Sitka, Alaska, for the summer to work at a "charter lodge."(A.R. 286, 287)

8 - FINDINGS & RECOMMENDATIONS

1  and Healy also tried a course of prednisone (*id.*), but her symptoms
2  persisted.   She reported feeling fatigued, and "having trouble
3  working long hours." (*Id.*)   Healy tested negative for H. pylori
4  infection. (A.R. 284)   Dr. Chelius ordered an EGD, which Healy
5  underwent on July 3, 2008.   (A.R. 285, 288) The doctor did not
6  observe anything abnormal during the procedure. (A.R. 297)   A
7  biopsy report of a duodenal bulb showed "histiocytic infiltration
8  consistent with Crohn's Disease." (A.R. 298)  However, on further
9  review at Dr. Chelius's request, doctors noted "[t]he mention of
10 Crohn's disease in our duodenal biopsy could well be a red herring,
11 as the presence of histiocytes in this location, while consistent
12 with, is not at all specific for this condition." (A.R. 299)   The
13 reviewing doctor noted "subtle findings of a mild, non-specific
14 inflammatory process in [the] colon biopsy." (*Id.*)

15      Healy saw Dr. Chelius for followup on July 8, 2008.   The
16 doctor explained that Healy did not have Crohn's Disease, but
17 instead "clearly ha[d] functional dyspepsia[.]"  (A.R. 335) He
18 gave Healy some articles to read regarding her diagnosis, its
19 expected course, and treatment options.   She was to read the
20 articles, and then call to schedule a followup appointment. (*Id.*)
21 In addition, notes indicate Healy had elevated liver enzymes.
22 Healy stated this had been evaluated in the past, so the doctor
23 planned to order and review Healy's old records before determining
24 treatment.   Notes also indicate Healy had a significant psycho-
25 logical history.  Healy stated she was in contact with her psychia-
26 trist; was taking her medications as directed; and was doing well.
27 (A.R. 334, 336)

28

9 - FINDINGS & RECOMMENDATIONS

1    Healy saw Dr. Eilersen for followup on September 18, 2008.
2    Notes indicate Healy had been diagnosed with ulcerative colitis in
3    the past, but her recent history was more consistent with Crohn's
4    disease.   She was continued on dicyclomine hydrochloride and
5    Miralax.   Notes also indicate Healy was taking Ambien as a sleep
6    aid; Cymbalta (an antidepressant) 30 mg., three tablets by mouth
7    daily; Loestrin FE for birth control; Pentasa 500 mg., eight
8    capsules daily for Colitis; and Xanax .5 mg., at bedtime.   (A.R.
9    350-51)
10    On October 6, 2008, Healy saw gastroenterologist Ronald J.
11    Lew, M.D. for evaluation of possible inflammatory bowel disease.
12    Notes indicate Healy had been seen by another doctor in the same
13    office a year earlier, but then she had moved to Alaska for
14    temporary employment.   Her prior medical records indicated Healy
15    "carrie[d] a diagnosis of ulcerative colitis since January 2001."
16    (A.R. 495)  She had been treated for periodic flares with predni-
17    sone.   A sigmoidoscopy in 2006, showed "no evidence of colonic
18    mucosal abnormalities and no evidence of inflammatory bowel
19    disease, nor microscopic colitis.  Because of this, it was surmised
20    that possibly [she] had Crohn's disease and not ulcerative
21    colitis."  (*Id.*) A colonoscopy, biopsies of the colon, and upper
22    endoscopy all had "completely normal findings." (*Id.*)  Removal of
23    Healy's gallbladder failed to have any effect on her pain symptoms.
24    (*Id.*)  Dr. Lew ordered CT enterography to evaluate Healy's small
25    bowel.   He opined Healy might have "ethanol induce[d] inflamma-
26    tion," although Healy indicated she had "cut back significantly" on
27    her alcohol use.  (A.R. 497) He recommended Healy continue taking
28    Pentasa, Bentyl (dicyclomine hydrochloride), and Prilosec, and try

10 - FINDINGS & RECOMMENDATIONS

1  to avoid any narcotic analgesic which could cause further upset in
2  Healy's bowels. (*Id.*)

3      Healy, accompanied by her father, saw Dr. Lew for followup on
4  November 14, 2008.   Dr. Lew reviewed Healy's "entire medical
5  record" with Healy and her father, explaining how Healy's prior
6  test results demonstrated no evidence of inflammatory bowel disease
7  or microscopic colitis.   (A.R. 386)  He noted Healy had been
8  treated for Crohn's disease based on her symptoms, although she had
9  no overt Crohn's disease findings.   In Dr. Lew's opinion, the most
10 likely diagnosis was IBS with constipation.  He directed Healy to
11 increase her Miralax and Colace; gave her a prescription for NuLev
12 (an antispasmodic); and discontinued Prilosec and Pentase.    He
13 directed Healy to call in two weeks to report on her symptoms, and
14 return for followup in four weeks.  (A.R. 488)

15     On December 16, 2008, on Dr. Lew's referral, Healy was evalu-
16 ated for possible participation in a clinical trial for a new drug
17 to treat ulcerative colitis.   She agreed to participate in the
18 study.   Her prior medical records were ordered to document her
19 history of colitis, and she was scheduled for further screening lab
20 tests. (A.R. 503)

21     Healy saw Dr. Lew on January 8, 2009, for followup.   She
22 continued to have "problems with her bowels . . . [with] abdominal
23 bloating and cramping, in addition to ongoing problems with
24 constipation." (A.R. 484)  The doctor indicated Healy did not have
25 a formal diagnosis of either ulcerative colitis or inflammatory
26 bowel disease.   Dr. Lew's diagnoses included irritable bowel
27 syndrome ("IBS") with constipation, and hemorrhoids.  He prescribed
28 Anusol suppositories for the hemorrhoids.    For the IBS, he

11 - FINDINGS & RECOMMENDATIONS

prescribed Kristalose (a colonic acidifier which stimulates bowel movements by increasing pressure by drawing water into the colon), and continuation of Miralax, Colace, and Benefiber. (A.R. 483-85)

Healy saw Dr. Eilersen for cold symptoms on January 28, 2009. Among other things, the doctor discontinued Pentasa and Xanax, noting both were "No Longer Needed." (A.R. 353)

On January 9 and February 6, 2009, Healy saw gastroenterologist Derek C. Taylor, M.D. for followup of ulcerative colitis. Healy had complaints of ongoing abdominal pain, alternating bouts of diarrhea and constipation, and bloody stools.  Initially, the doctor counseled Healy on "gut function," and recommended a high fiber diet, doubling her current fiber supplement and withdrawing all other laxatives.  When the increased fiber was not effective, the doctor scheduled Healy for a colonoscopy (A.R. 416-18), which he performed on February 9, 2009.  Specimens from her ascending, transverse, and descending colon were collected and microscopically examined, with none of them evidencing any pathologic diagnosis. However, rectosigmoid specimens were "compatible with chronic ulcerative colitis," diffusely involving "all tissue fragments." (A.R. 360)  Dr. Taylor advised Healy to continue on Rowasa and prednisone.  (A.R. 726)

Healy saw Dr. Parsons on February 28, 2009, after not seeing him for ten months.  She was feeling more depressed, and noted she had been prescribed prednisone recently for a colitis flare, which had produced depression, mood swings, and irritability.  Healy was working at a small law office, and indicated she had become irritable at work, as well.  The doctor added Abilify 10 mg. at night, and continued her other medications.  (A.R. 761)

12 - FINDINGS & RECOMMENDATIONS

Healy, accompanied by her father, saw Dr. Taylor for followup on February 26, 2009. Healy complained of ongoing abdominal pain, diarrhea, bloody stools, and pressure. She expressed frustration with her lack of improvement. She had stopped taking prednisone because it aggravated her mood swings. Notes indicate she was "seeing a psychiatrist for bipolar disorder[.]" (A.R. 413) Healy was unemployed at this time, and was "very worried about finances," noting she was "struggling with debt related to medical bills." (*Id.*) She inquired about a colectomy[6] as a possible treatment option, but Dr. Taylor was "very reluctant to proceed with colectomy for very limited left sided disease." (A.R. 414) At Healy's insistence, he referred her to a surgeon for consultation, but advised her the surgeon likely would decline to perform the procedure. Healy agreed to a trial of Remicade[7], which the doctor indicated was "aggressive . . . for isolated distal disease." (*Id.*) Healy authorized Dr. Taylor to speak with her psychiatrist regarding her condition and treatment. In his notes, Dr. Taylor questioned whether Healy's psychological diagnoses could be contributing to her symptoms. (*Id.*)

---

[6]"Colectomy is a surgical procedure to remove all or part of [the] colon." http://www.mayoclinic.org/tests-procedures/colectomy/basics/definition/prc-20013604 (visited 8/25/14).

[7]    Remicade is indicated for reducing signs and symptoms and inducing and maintaining clinical remission in adult patients with moderately to severely active Crohn's disease who have had an inadequate response to conventional therapy.

http://www.rxlist.com/remicade-drug/indications-dosage.htm (visited 08/22/14).

13 - FINDINGS & RECOMMENDATIONS

On April 9, 2009, Healy saw Dr. Taylor for followup of her Remicade infusion. Healy was "very pleased with her response to Remicade. She noticed rapid response after initial two infusions," and her left upper quadrant pain and fecal urgency had resolved. (A.R. 411) However, she complained of what she called "mystery pain" – a pain in the periumbilical area that would occur most often in the morning prior to going to work. The pain was accompanied by nausea, but no vomiting. She had tried Nortriptyline in the past for pain, and stated it had been effective. The doctor noted Healy "admits to high anxiety and agrees that she may experience her anxiety within her abdomen." (*Id.*) She was seeing a psychiatrist and therapist for treatment. Healy was unemployed currently. Notes indicate she had been in an ROTC program during college, but she had been unable to complete the program due to her chronic ulcerative colitis. (A.R. 412) Dr. Taylor opined Healy's abdominal pain was "likely functional," with her history of high blood pressure "rais[ing] possibility of biliary colic." (*Id.*) He planned to "[d]iscuss with psychiatry use of Nortriptyline starting at 25mg [at bedtime] – titrate as tolerated to goal 75mg." (*Id.*) Healy's lab results indicated her liver enzymes had returned to normal levels. (A.R. 720)

On April 13, 2009, Healy underwent an abdominal ultrasound to evaluate her complaints of epigastric and abdominal pain. Changes visualized to Healy's pancreas suggested possible pancreatitis, "or a more diffuse infiltrative process." (A.R. 357) A CT with contrast of Healy's abdomen was performed on April 16, 2009, showing a "normal-appearing pancreas" (A.R. 386-87), and normal liver and bile ducts. Dr. Taylor believed the ultrasound findings

14 - FINDINGS & RECOMMENDATIONS

were a "false positive test," and the CT scan was much more reli-
able.  (A.R. 642)  An ultrasound-guided liver biopsy on April 27,
2009, showed "non-specific reactive changes (cannot rule out early
primary sclerosing cholangitis)[.]"  (A.R. 384)

Healy saw Dr. Parsons on April 14, 2009, and reported that her
mood had been "excellent."  (A.R. 762)  She had moved in with a
boyfriend, and they were getting along well.  She had a new part-
time job at a law firm that she was enjoying.  She continued to see
her therapist regularly.  She had stopped taking Abilify because of
side effects, but continued on Cymbalta, Ambien, and Ativan.  (*Id.*)

On May 11, 2009, Dr. Taylor performed an endoscopic retrograde
cholangiopancreatography with sphincterotomy, to evaluate Healy's
recurrent right upper quadrant and epigastric pain.  The study
showed no biliary ductal obstruction or ductal irregularities.  The
doctor suggested Healy's ongoing symptoms could be due to Sphincter
of Oddi dysfunction.[8]  (A.R. 374-78)

Healy saw Dr. Parsons on May 20, 2009.  She was feeling more
depressed, which she attributed to her colon pain.  The doctor
suggested "the pain could have psychological origins especially
since [Healy] has a [history] of sexual trauma."  (A.R. 762)  Her
medications were continued without change.  (*Id.*)

Healy saw Dr. Taylor for followup on May 22, 2009.  She was
accompanied by her fiancé.  Healy was pleased with her response to
Remicade.  She "continue[d] to struggle with periods of fatigue and
pain.  However, she admit[ted] the pain [was] much less prominent
than before."  (A.R. 407)  Dr. Taylor noted:

_____

[8]*See* note 2, *supra*.

15 - FINDINGS & RECOMMENDATIONS

> She has discussed disability with her psychia-
> trist and would like to ask for my support in
> her decision to explore this.  We discussed
> this at length including why she feels that
> her condition is causing her disability.  Her
> response is that at times she doesn't feel
> like going to work because of fatigue, abdomi-
> nal pain and or diarrhea.  She is fearful
> because she will find that after a period of
> time of feeling good her condition will change
> and she will [be] out of work for long periods
> and thus loose [sic] her job.

(*Id.*)  Notes indicate Healy was working as a legal assistant in Portland at this time.  (A.R. 408)  After an hour of discussion regarding Healy's condition, including her diagnoses and treatment options, Dr. Taylor noted that both Healy and her fiancé were "thankful for discussion and all [are] in general agreement to pursue other options before exploring disability."  (*Id.*)  Among other things, Healy agreed to "explore treatment with psychiatry."  (*Id.*)

Dr. Taylor wrote to Healy on July 12, 2009, informing her that her lab results from July 9, 2009, were normal.  Her liver enzymes were not elevated, and the doctor did not believe Sphincter of Oddi Syndrome was the cause of Healy's pain.  (A.R. 641)

Healy saw Dr. Parsons on June 17, 2009, complaining of increased depression due to work and personal issues.  Her medications were continued without change; however, Dr. Parsons noted if Healy had no improvement by her next followup, he would consider augmenting with bupropion.  (A.R. 762)

When Healy next saw Dr. Parsons, on July 15, 2009, she complained of increased depression accompanying increased pain. Dr. Parsons added bupropion 150 mg. daily, continuing Healy's other medications without change.  (*Id.*)  On August 6, 2009, Healy

16 - FINDINGS & RECOMMENDATIONS

complained of insomnia, decreased appetite with nausea, headaches, and "a great deal of abdominal pain." (*Id.*) The doctor increased the bupropion dosage to 300 mg. daily. (*Id.*)

On August 7, 2009, Healy saw Dr. Taylor complaining of ongoing pain in her left upper quadrant, accompanied by loose stools. Healy was "frustrated because she [had] pain everyday[.]" (A.R. 402) According to Healy, her psychiatrist believed her pain was "not related to psychiatric problems." (*Id.*) The doctor ordered a colonoscopy and EGD. (A.R. 405)

Dr. Taylor performed the EGD on August 11, 2009, for evaluation of Healy's gastritis, abdominal pain, and chronic ulcerative colitis, "Rule out sprue and gastritis." (A.R. 361) Specimens from her duodenum showed no active inflammation, or other significant pathologic changes. Specimens from her stomach showed chronic gastritis, with "no evidence of intestinal metaplasia or dysplasia." (*Id.*) A test for H. Pylori was negative. (A.R. 363) Healy showed "no signs of pancreatitis, hepatobiliary abnormality, or evidence of active colitis." (A.R. 371-72)

Dr. Taylor also performed a colonoscopy on August 11, 2009, to "evaluat[e] [Healy's] colon for progression of her ulcerative colitis." (A.R. 367) Healy "had responded well to Remicade after failure on corticosteroids and 5 ASA products." (*Id.*) Healy's colon showed "[n]o evidence of active or worsening ulcerative colitis; normal ileum." (*Id.*) The doctor's impressions were: (1) "Inactive ulcerative colitis with excellent, if not complete, response to Remicade."; and (2) "Left upper quadrant pain. No source identified on colonoscopy. Will proceed with upper endoscopy." (A.R. 368)

17 - FINDINGS & RECOMMENDATIONS

1    When the colonoscopy and EGD failed to reveal a cause for
2  Healy's ongoing abdominal pain, Dr. Taylor "recommended that she
3  pursue management of her pain with tricyclic antidepressants."
4  (A.R. 372)  He prescribed Ultram for pain, but noted his recommen-
5  dation against narcotic pain medications.  (*Id.*)

6    Healy saw Dr. Taylor on September 23, 2009.  Notes indicate
7  Healy had suffered a reaction during her last Remicade infusion,
8  consisting of shortness of breath and chest tightness.  (A.R. 396)
9  Her symptoms resolved after the infusion was discontinued, and she
10 was willing to try again.  Healy reported that her bowels were
11 "fine."  (*Id.*) She was scheduled for another Remicade infusion,
12 with a prophylactic prescription of Loratadine 10 mg. for five days
13 prior to the infusion.  Healy's current medications included Dicy-
14 clomine HCI 20 mg., one tablet every six hours as needed, for IBS
15 pain; Ultram 50 mg., "[a]s directed," for pain; Ativan three times
16 daily, for anxiety; Spironolactone 50 mg./daily, for hypertension;
17 Loestrin for birth control; Cymbalta 30 mg. three times daily, for
18 depression;  Wellbutrin  300  mg./daily,  for  depression;  and  a
19 Remicade infusion every eight weeks.  (A.R. 396-97)  Dr. Taylor's
20 current assessment of Healy included "Ulcerative colitis - left
21 sided - clinical improvement on Remicade"; "Abdominal pain - likely
22 functional [could be] possible [Sphincter of Oddi dysfunction]";
23 "Interval improvement in elevated ALT after sphincterotomy"; "Per-
24 sonality disorder - patient reports bipolar disorder"; history of
25 suicidal ideation/attempt; and status post "lap cholecystectomy."
26 (A.R. 397)

27    Healy also saw Dr. Parsons on September 23, 2009.  She had
28 lost a temporary job she loved when the person she was replacing
18 - FINDINGS & RECOMMENDATIONS

returned from medical leave.  She was taking a trip to San Diego to visit her sister-in-law and baby nephew.  Her medications were continued without change.  (A.R. 763)  At her next visit, on October 22, 2009, she reported feeling more stable.  The previous week, she had called the doctor's office "saying she was suicidal.  She contacted her therapist and was able to avoid hospitalization."  (A.R. 763)  Her medications were continued without change.  (*Id.*)

On October 28, 2009, Healy saw her regular OB/GYN Sharrel M. Carlton, M.D. for a preventive health exam.  Among other things, Healy stated she was dissatisfied with her limited treatment options for her ulcerative colitis, and she was scheduled to consult with a surgeon the next day.  (A.R. 470)

Healy saw Dr. Parsons on November 18, 2009.  She had been mildly depressed, and was having trouble sleeping because her insurance would only pay for 14 days per month of Ambien.  Healy reported "chronic suicidal thoughts."  (A.R. 763)  Her medications were continued without change.  (*Id.*)

Healy saw surgeon David O'Brien, M.D. for a consultation on October 29, 2009, on referral from Dr. Taylor.  Notes indicate Healy was interested in "a possible ileoanal pouch procedure"[9] to treat her ulcerative colitis.  (A.R. 498)  Healy indicated Remicade was helping "tremendously" with her symptoms, and she had not had

---

[9]"Ileoanal anastomosis surgery (commonly called J pouch) allows [the patient] to eliminate waste normally after removal of the upper and lowest parts of the large intestine (colon and rectum). . . .  Ileoanal anastomosis is most often used to treat chronic ulcerative colitis and inherited conditions . . . that carry a high risk of colon cancer."  http://www.mayoclinic.org/tests-procedures/ ileoanal-anastomosis-surgery/basics/definition/prc-20013306 (visited 08/26/14).

19 - FINDINGS & RECOMMENDATIONS

1    a flare since July 2009. (*Id.*) She was asymptomatic currently.

2    Her past medical history was significant for ulcerative colitis,

3    borderline personality disorder, depression, insomnia, headaches,

4    and a 2007 cholecystectomy. Healy had quit smoking recently, and

5    was engaged to be married. After a review of Healy's medical

6    history and an examination, Dr. O'Brien felt Healy's condition was

7    more consistent with colitis than with Crohn's disease. He dis-

8    cussed the surgery with Healy in detail, including explaining the

9    risks that could lead to pouch loss, and he gave her some

10   literature to review. He planned to discuss Healy's case with

11   Dr. Taylor, and he directed Healy to contact him if she decided to

12   proceed with the surgery. (A.R. 498-99)

13       On December 16, 2009, Healy saw Internist Steven M. Hohf,

14   M.D., for general followup. Healy requested "a limited quantity of

15   Percocet," stating she was having "increased trouble with fatigue

16   and myalgias." (A.R. 630) Healy was unsure whether her symptoms

17   were related to her colitis, or to her Remicade infusions. Healy

18   signed a narcotic contract, and the doctor prescribed 20 Percocet

19   to last a month. He advised Healy that he would inform Drs. Taylor

20   and Parsons about the prescription, as well. He directed Healy to

21   follow up in one month. (*Id.*)

22       On December 23, 2009, counselor Jonnie M. Vanderzanden, LPC

23   completed a Mental Status Report regarding Healy. She indicated

24   Healy had undergone intensive outpatient treatment from September

25   to December 2006, with daily sessions from 9:00 a.m. to 3:00 p.m.

26   Healy then began seeing psychiatrist Bowen S. Parsons, M.D. in

27   January 2007. Healy began sessions with the counselor in March

28   2007. Vanderzanden indicated many of Healy's symptoms are related

20 - FINDINGS & RECOMMENDATIONS

to her chronic pain, which creates mood swings, suicidal ideation, anger, and impulsivity. She stated Healy suffers from lack of trust, poor boundaries, and an inability to understand her impact on others. She further indicated Healy had a history of self-medicating, but through treatment, she had overcome her abuse of pain medications and no longer was self-medicating. (A.R. 507-08)

Vanderzanden stated Healy had been treated with EMDR, biofeedback, cranial electrostimulation, and cognitive behavior therapy. Healy's diagnoses included PTSD, borderline personality disorder, and depression related to her medical issues. According to the counselor, Healy's activities of daily living are "entirely dependent" on her ulcerative colitis symptoms. She indicated Healy can become "physically disabled due to severe abdominal pain [and] diarrhea." (A.R. 508) The counselor had observed that when Healy was in pain, her posture would be slouched, her speech would be slower, and she would appear more depressed. When Healy was having severe pain, she did not want to come to her counseling sessions. (A.R. 507) According to Vanderzanden, Healy's social interactions are limited by her ulcerative colitis, which increases her anxiety and depression. Although Healy was "strongly motivated to work and to follow all medical options," Vanderzanden indicated Healy currently was unable to work full time and maintain her health. (A.R. 508)

Vanderzanden further indicated Healy's concentration, persistence, and pace are impacted by the severity of her pain, and the ongoing symptoms of her ulcerative colitis. Vanderzanden does not say whether the "impact" is mile, moderate or severe. According to Vanderzanden, Healy experienced severe side effects

1   lasting several days following each Remicade infusion.    The

2   counselor indicated at least one of Healy's former employers had

3   questioned Healy frequently about her medical treatment, indicating

4   she was missing too much time off work.  (A.R. 509) Vanderzanden

5   stated Healy was living in a "[s]upportive or structured

6   environment." (*Id.*)  She indicated Healy's medical treatment had

7   been very expensive, exceeding Healy's ability to meet the costs,

8   and forcing Healy into bankruptcy. (*Id.*)  The counselor indicated

9   the completed evaluation form had been faxed to Dr. Parsons for his

10  signature, which had not been obtained because Dr. Parsons was on

11  vacation.  (*Id.*)

12      Healy underwent a colonoscopy on December 28, 2009, with

13  normal findings.  (A.R. 707-08) The gastroenterologist, Edward A.

14  Galen, M.D., advised Healy to continue on Remicade.  He noted, "I

15  see no reason to pursue surgery at this time."  (A.R. 708)

16      On January 27, 2010, family practitioner Richard Alley, M.D.

17  reviewed the record and completed a Physical Residual Functional

18  Capacity ("RFC") Assessment form.  (A.R. 510-17) He opined Healy

19  would be able to lift up to 50 pounds occasionally and 25 pounds

20  frequently; stand/walk and sit for about six hours, each, in an

21  eight-hour workday; and push/pull without limitation.  He opined

22  Healy would have no postural, manipulative, visual, communicative,

23  or environmental limitations.  (*Id.*)  In Dr. Alley's explanatory

24  notes, he indicated Healy's activities of daily living include

25  looking for work online, cooking, doing all housework, driving,

26  taking the bus, shopping, going out to eat and to events,

27  exercising with her fiancé, walking for 60 minutes, and running

28  errands.   He indicated Healy volunteers at the sexual assault

22 - FINDINGS & RECOMMENDATIONS

resource center, but must be near a bathroom; she naps at least
once a day for a few hours; she can be active for three to five
hours before having to rest; her condition is unpredictable; and
her medical bills caused her to have to declare bankruptcy. (A.R.
517)   Dr. Alley found Healy's statements to be only partially
credible, noting Healy "works out at the gym for an hour a day and
volunteers, can walk 60 minutes, skis, etc.  Her gastroenterologist
says she is asymptomatic and suggests there is a functional reason
for some of her pain." (*Id.*)  Dr. Alley concluded Healy would need
to "work in an area with reasonable access to bathroom facility."
(*Id.*)

On February 4, 2010, Healy underwent a comprehensive psycho-
diagnostic evaluation with clinical psychologist Kay Stradinger,
Psy.D., at the request of Disability Determination Services. (A.R.
518-24)  In particular, DDS wanted the doctor to obtain "a detailed
history of [Healy's] drug and/or alcohol use." (A.R. 518)  The
doctor reviewed Healy's history of borderline personality disorder,
anxiety/PTSD, Depression, and Insomnia, as well as all of Healy's
current medications. (A.R. 518-20)  She also reviewed Healy's past
medical history, and her employment history. (A.R. 520)  Among
other things, Healy reported that she had done "everything she
could to achieve her wish for an ROTC college scholarship prior to
being granted one.  She had hoped to have a career in the
military." (*Id.*)  Regarding Healy's history of using alcohol and
other drugs, Dr. Stradinger noted the following:

> [Healy] states that when she was in day
> treatment at Providence she had a cooccurring
> counselor who helped her to see that she was
> self medicating with alcohol.  She has not
> used alcohol currently and the last use was

23 - FINDINGS & RECOMMENDATIONS

two years ago.  Prior to that from ages 21-26
she states that she was engaging in heavy
drinking on the weekends and gradually drink-
ing even beyond the weekends; looking back,
she says that she would call herself an alco-
holic.

She obtained the medical marijuana card at her
gastroenterologist's recommendation she says.[10]
She states that she vaporizes medical mari-
juana now and uses it almost every day
although she tries not to some days.  Regard-
ing questions of abuse or dependance [sic] on
pain medications, she states that in summer
2008 she was starting to feel that she might
be getting dependent on the narcotics being
prescribed by her doctor for pain so they did
help her go through withdrawals over several
months['] time.  She states that she knows she
is a person with "addictive tendencies" and
therefore she tries to keep her various
medical providers aware of this, telling them
about each other and the medications she is
on.

(A.R. 521)

Regarding Healy's activities of daily living, Healy reported

that she was living with her boyfriend, and she received "income

from her father."  (*Id.*)  She had to declare bankruptcy the pre-

vious year due to medical expenses.  She stated she is "independent

for all activities of daily living including cooking, cleaning,

grocery shopping, managing her money, and managing her medication."

(*Id.*)  On a typical day, Healy will go to doctors' appointments

(seeing her doctor once a week, and her therapist once a week);

spend time with her mother, and talk to her mother on the phone;

take a hike; visit her father at his beach house; care for her two

guinea pigs; and do volunteer work on a crisis line and as an

advocate.  Healy stated she had done the volunteer work for more

_____

[10]The Court finds no medical record to support plaintiff's
statement in this regard.

24 - FINDINGS & RECOMMENDATIONS

than a year, averaging about thirty hours a month.  The doctor noted Healy "states she loves [the volunteer work] because she feels empowered to help people who have been through what she has been through regarding sexual assault."  (*Id.*)

The doctor observed that Healy was able to concentrate adequately during the evaluation.  "Her persistence was adequate and she gave good attention to the task.  The pace of the evaluation was average."  (A.R. 521-22)

After completing her assessment of Healy's mental status, the doctor listed Healy's DSM-IV diagnoses as "Axis I: Anxiety disorder NOS, Rule out posttraumatic stress disorder, Depressive disorder NOS, Rule out major depressive disorder, Cannibis [sic] dependence in a controlled setting, Alcohol dependance [sic] in full sustained remission per [Healy], Opioid pain medication dependance [sic], in a controlled environment;" and "Axis II: Borderline personality disorder per history."  She assessed Healy's current GAF at 55.[11]

Dr. Stradinger opined that Healy's psychiatric problems "are treatable."  (A.R. 524)  She noted some difficulty in determining the degree to which Healy's insomnia, depression, and anxiety could be impacted by her medications and use of marijuana.  She concluded that, given Healy's "current disorders and long history of treatment[,] her conditions are unlikely to improve significantly within the next 12 months."  (*Id.*)

---

[11]A GAF of 55 "indicates '*moderate*' difficulty in social, occupational, or school functioning." *Melton v. Comm'r*, slip op., No. 10-35953, 2011 WL 2727869, at *1 (9th Cir. July 14, 2011) (citing *DKM-IV* at 34).

25 - FINDINGS & RECOMMENDATIONS

Specifically regarding Healy's mental functional limitations, the doctor found as follows:

> [Healy] is capable cognitively of performing simple and repetitive work type tasks. She likely could perform more complex and difficult tasks independently, however she might have trouble doing that on a sustained basis or doing it effectively and appropriately given her history of conflicts in other work settings and her personality traits.
>
> [She] likely would have some difficulty interacting effectively and on a sustained basis with supervisors, coworkers, and the public given her personality disorder, her mood and anxiety issues.
>
> [She] likely would have a difficult time concentrating and sustaining her focus in a job for a long period of time given her personality traits and her depression.

(*Id.*)  Dr. Stradinger further indicated Healy appeared to be "capable cognitively of managing her funds."  (*Id.*)

On February 18, 2010, clinical psychologist Megan D. Nicoloff, Psy.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 525-38), and a Mental RFC Assessment form (A.R. 539-41) regarding Healy.  The doctor evaluated Healy under Listings 12.04 Affective Disorders, indicating Healy has a depressive disorder; 12.06 Anxiety-Related Disorders, indicating Healy has an anxiety disorder; 12.06 Personality Disorders, indicating Healy has "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subject distress, as evidenced by . . . [p]ersistent disturbances of mood or affect . . . and [i]ntense and unstable interpersonal relationships and impulsive and damaging behavior"; and 12.09 Substance Addiction Disorders, noting Healy exhibits "[b]ehavioral changes or physical changes associated with

26 - FINDINGS & RECOMMENDATIONS

the regular use of substances that affect the central nervous system." (A.R. 525-33)

Dr. Nicoloff found Healy has a mild limitation in restriction of her activities of daily living, and moderate limitations in difficulties maintaining social functioning, and maintaining concentration, persistence, or pace. (A.R. 535) The doctor discounted the opinions of Healy's counselor Jonnie M. Vanderzanden, noting Vanderzanden is not "a recognized source," and finding her opinions to be "inconsistent with other evidence as well as [Healy's] own stated [activities of daily living]." (A.R. 537) Dr. Nicoloff noted Healy had worked at the substantial gainful activity level recently, without needing a supported or structured environment. She also found Vanderzanden's opinion to be based largely on Healy's self-report, and noted the therapist had not measured whether Healy's pain actually impacts her functioning. Dr. Nicoloff concluded Vanderzanden's opinion was speculative; was offered on subjects reserved to the Commissioner; and were "out of her area of expertise." (*Id.*)

Dr. Nicoloff gave only partial weight to the opinions of clinical psychologist Kay Stradinger, who performed the psychodiagnostic evaluation, because Dr. Stradinger had "not made a case for difficulty interacting w/coworkers and supervisors." (*Id.*) Dr. Nicoloff noted:

> [Healy] says she has many past jobs because she likes change and generally likes to move. She was offered a permanent position with nearly every temp job she worked. She says that she left some jobs [due to] flare ups in her [ulcerative colitis] and not [due to] personality conflicts. She also acts as a victim advocate and para-counselor and says it makes her feel empowered. She also says she

27 - FINDINGS & RECOMMENDATIONS

1
2

> is a thorough person and despite her allega-
> tions was able to ace the MMSE [Mini Mental
> Status Examination].

3    (*Id.*) Dr. Nicoloff concluded that, from a mental standpoint, Healy

4    "can perform simple/routine work w/limited public/coworker contact

5    and supportive supervisor." (*Id.*)

6        On the Mental RFC Assessment form, Dr. Nicoloff indicated

7    Healy would be moderately limited in the ability to carry out

8    detailed instructions; maintain attention and concentration for

9    extended periods; interact appropriately with the general public;

10   accept instructions and respond appropriately to criticism from

11   supervisors; get along with coworkers or peers without distracting

12   them or exhibiting behavioral extremes; maintain socially appropri-

13   ate behavior, and adhere to basic standards of neatness and

14   cleanliness; be aware of normal hazards and take appropriate

15   precautions; and set realistic goals or make plans independently of

16   others. (A.R. 539-40)  In her narrative, the doctor indicated the

17   following:

18
19
20
21
22

> [Healy] has no difficulty performing simple/
> routine tasks of a 1-2 step, repetitive nature
> and oftentimes will have no difficulty with
> following complex/detailed instructions or
> concentrati[ng] for long periods of time.  But
> she cannot do so consistently as her [symp-
> toms] sometimes would preclude performing
> complex/detailed tasks that require extreme
> levels of concentration.

23
24
25
26
27

> [Healy] has no difficulty engaging in casual
> social contact and most of the time has no
> difficulty getting along w/others but occa-
> sionally her personality [disorder] would
> interfere with the ability to do so con-
> sistently.  [T]herefore she is precluded from
> working closely with the public, would work
> best alone and would perform best with a
> supportive supervisor.  Cannabis use would
> preclude working near heights, hazards and

28

28 - FINDINGS & RECOMMENDATIONS

1          heavy machinery. She would benefit from
2          assistance in setting realistic goals.

3  (A.R. 541)

4      Healy saw Dr. Parsons on March 4, 2010, the day before her

5  wedding. She had been very anxious about the wedding, although her

6  mood had been good. The doctor prescribed .5 mg of Xanax as needed

7  for "wedding and associated anxiety." (A.R. 763)

8      On April 13, 2010, Dr. Willet and Healy's counselor Cynthia

9  Parker, Ph.D. conducted a Behavioral Health Comprehensive Assess-

10 ment of Healy. (A.R. 781-90) Healy's suicidal ideation had

11 increased, including more intense and more frequent fantasies about

12 suicide. Her chronic symptoms from her ulcerative colitis had

13 increased, exacerbating her depression. Healy indicated she was

14 "waiting for news on a job and SSD and [she was] 'nervous' about

15 her safety if she [was] 'rejected.'" (A.R. 781) Healy's treatment

16 goals included getting "stabilized again"; developing a better

17 ability to tolerate physical pain; and developing skills to manage

18 her distress. (*Id.*) A one-year treatment plan was developed to

19 include Healy's attendance at one dialectical behavior therapy

20 ("DBT")[12] group session and one individual psychotherapy session

21 each week. (A.R. 791)

22

23          [12]The National Alliance on Mental Illness describes DBT as a
24 treatment method for "chronically suicidal and self-injurious
   individuals with borderline personality disorder," incorporating
25 "different types of psychosocial therapies (e.g., individual
   psychotherapy, group skills training and even phone consultations)"
26 to help the patient "work on 'accepting' uncomfortable thoughts,
   feelings and behaviors rather than struggling with them."
27 http://www.nami.org/Content/NavigationMenu/Inform_Yourself/About_
   Mental_Illness/About_Treatments_and_Supports/Dialectical_Behavior
28 _Therapy_(DBT).htm (visited 10/07/2014).

29 - FINDINGS & RECOMMENDATIONS

1    When Healy next saw Dr. Parsons, on April 28, 2010, she stated
2    her wedding had been "a great experience." (*Id.*) Her husband was
3    supportive and stabilizing for her. The doctor noted Healy "was
4    denied disability even though she is not able to work full time.
5    Her chronic pain, anxiety, depression and borderline features make
6    this difficult for her. She has very little tolerance for stress
7    and conflict." (*Id.*)

8    On May 14, 2010, Healy saw Dr. Hohf for followup of her
9    ulcerative colitis and chronic pain. The doctor referred Healy to
10   a specialist for consultation regarding possible colectomy, and
11   also referred her to a pain clinic. (A.R. 745)

12   On June 7, 2010, Healy saw gastroenterologist George Koval,
13   M.D. for "ongoing symptoms of bleeding, diarrhea and pain, which
14   abate for the four weeks following . . . Remicade infusion, but
15   then return prior to reinfusion." (A.R. 549) Healy also was
16   experiencing both acute and delayed reactions to the Remicade,
17   including "flushing and a difficulty in breathing, although not
18   specifically wheezing during each infusion." (*Id.*) Beginning a
19   few days after the infusion, she would experience widespread
20   aching, headache, and pain in her mid upper abdomen. She was
21   taking about 20 Percocet per month "for the purpose of taking the
22   edge off the most severe abdominal symptoms." (*Id.*) Dr. Koval
23   noted that despite minimal inflammatory bowel findings, Healy had
24   experienced "rather substantial symptomatology" over the years,
25   which the doctor indicated could reflect "a post inflammatory
26   irritable bowel syndrome or primary irritable bowel syndrome with
27   additional features of chronic inflammatory bowel disease involving
28   the rectum." (A.R. 551-52) Although Remicade improved Healy's

30 - FINDINGS & RECOMMENDATIONS

symptoms, the doctor expressed concern regarding the potential complications of Healy's acute and delayed reactions to the drug. In addition, he found it "fairly surprising" that Healy's colitis symptoms returned between her infusions, suggesting the possibility of "an etiology other than colitis." (A.R. 552)  He also noted Healy's psychiatric diagnoses could "influence perception as well as bowel function." (*Id.*)  Dr. Koval explained that Healy was not a candidate for a current clinical trial for treatment of ulcerative colitis.  He indicated it would be difficult to justify a total colectomy "on the basis of active inflammatory bowel disease," and although the surgery might be indicated if Healy had "a state of chronic bowel irritability post extensive colitis (not identified since 2001)," he advised Healy to consider the implications of the surgery very carefully, "particularly as they may relate to her reproductive ability." (*Id.*)

Healy saw counselor Cynthia Parker, Ph.D. on June 14, 2010, complaining of suicidal ideation without intent or plan; problems calming herself down after becoming upset; and feelings of emptiness and hopelessness.  She was attending school a couple of days a week, and working at a volunteer job.  However, she was functioning poorly in relationships.  Dr. Parker indicated Healy was "stabilized in treatment and [was] now ready to step down to a lower level of care to help her to gain skills in emotional regulation, distress tolerance and interpersonal effectiveness." (A.R. 778)  Healy was scheduled to begin weekly sessions with her therapist to prepare her for a treatment group when there was an opening. (*Id.*)

31 - FINDINGS & RECOMMENDATIONS

On June 17, 2010, Healy saw Kimberly M. Kaplan, M.D. and Samantha L. Hansen, M.D. at the Comprehensive Pain Center, for consultation regarding Healy's ongoing "random body aches." (A.R. 615; *see* A.R. 615-22)  The doctors concluded that Healy's physical examination and history could be "consistent with a diagnosis of fibromyalgia," but also could be "consistent with the diffuse pain secondary to her Remicaid [sic] treatments and a definitive diagnosis cannot be made while these treatments continue." (A.R. 621)  Nevertheless, the doctors stated that "[e]ither way, long acting opioid treatment in the context of comprehensive pain management is the treatment of choice.  This would include an evaluation with the pain psychologist and physical therapist . . . with subsequent followup with Dr. Kaplan."  The doctors' recom-mendations included a diagnostic evaluation to distinguish the etiology of Healy's diffuse pain; a GI surgery consult for a second opinion regarding available options; and, if Healy's psychologist or psychiatrist approved, Healy should be started on "long acting opioids for presumed fibromyalgia and [ulcerative colitis] flares," including MS Contin 15 mg. twice daily or Oxycontin 10 mg. twice daily. (A.R. 621-22)

Healy saw Dr. Hohf for followup of her chronic pain on June 23, 2010.  Notes indicate the doctor had received and reviewed Dr. Kaplan's consultation report regarding treatment of Healy's chronic pain.  In addition, Healy was seeing Dr. Koval for management of her ulcerative colitis, and she saw her psychiatrist Dr. Parsons monthly.  Healy signed a narcotic contract, and Dr. Hohf started her on generic MS Contin, and continued her on oxycontin for breakthrough pain, to be used minimally. (A.R. 614)

32 - FINDINGS & RECOMMENDATIONS

On June 28, 2010, Healy was admitted to the hospital for increasingly suicidal thoughts due to pain from her colitis. (A.R. 602; *see* A.R. 594-612) Healy stated she had been thinking of overdosing on her medications. When she was unable to reach her counselor by phone, Healy's husband accompanied her to the E.R., where she was admitted to the hospital's psychiatric unit. Notes indicate Healy's suicidal ideation was deemed a possible side effect from the MS Contin, which was stopped. Her dosage of Cymbalta was increased, and Seroquel was added. (A.R. 610) Healy was discharged on July 1, 2010, with a diagnosis of Major Depression, recurrent, severe; and borderline personality disorder by history. She agreed to enter an outpatient treatment program at the hospital, and to follow up with her counselor. (A.R. 604)

A hospital admission form appears in the record dated July 6, 2010, showing a diagnosis of Major Depression-Recurrent-Severe. However, no treatment notes or other records accompany the form. (A.R. 776)

On July 7, 2010, Healy saw Dr. Koval for followup of her colitis symptoms. Healy complained of ongoing pain, and mild bleeding and diarrhea. The doctor noted it was unclear whether Remicade was continuing to benefit Healy, and he recommended discontinuing the Remicade infusions. He opined some of Healy's musculoskeletal pain could be from the Remicade. Healy declined to discontinue the Remicade, expressing her fear that her symptoms would worsen. She also expressed her desire "to proceed with colectomy to treat her colon [symptoms]." (A.R. 546) The doctor again reminded Healy and her husband "of the potential complications of colectomy." (*Id.*) He suggested colectomy could be

33 - FINDINGS & RECOMMENDATIONS

1    considered in the future, if Healy's symptoms worsened.    Notes
2    indicate Healy "appeared very emotionally distressed by this sug-
3    gestion," although the doctor believed it to be "a reasonable
4    solution." (*Id.*) He also advised Healy to seek a second opinion
5    regarding the advisability of colon resection. (A.R. 547)

6        Also on July 7, 2010, Healy saw Dr. Parsons for followup. She
7    had been hospitalized with suicidal ideation, and had felt more
8    depressed due to her chronic abdominal pain. She was frustrated
9    and irritable at a surgeon's opinion that she was not a candidate
10   for a total colectomy at this time. She was enjoying a volunteer
11   job working with AIDS patients. Her medications were continued
12   without change. (A.R. 763-64)

13       Healy saw Dr. Kaplan for followup of chronic pain and
14   fibromyalgia on July 8, 2010. (A.R. 586-90) Healy reported
15   increased pain since her last visit, particularly in the joints of
16   her upper body, and bilateral shoulders, knees, and wrists. Her
17   pain worsened with over-activity. She had discontinued morphine
18   due to stomach pain. Healy was encouraged to wean off of all opi-
19   oids eventually, especially short-acting therapies like oxycodone.
20   Dr. Kaplan recommended a trial of oxycontin and gabapentin,
21   although she noted that if Healy's recent hospitalization had
22   anything to do with overuse or misuse of opioids, Healy should not
23   be continued on opioids. (A.R. 589)

24       On July 9, 2010, during reconsideration of Healy's application
25   for benefits, Physical Medicine specialist Neal E. Berner, M.D.
26   reviewed the record regarding Healy's physical impairments. He
27   noted Healy had not had a flare of her ulcerative colitis since
28   July 2009, and had never been hospitalized for this condition. In

34 - FINDINGS & RECOMMENDATIONS

August 2009, Healy "reported sometimes not like [sic] working due to pain, fatigue and diarrhea.  Otherwise she reports no exertional limitations, but requires being close to a bathroom."  (A.R. 543)  Dr. Berner affirmed the RFC that limited Healy to medium exertion without sitting or standing limitations, as long as Healy had a work area with reasonable access to a bathroom.  (*Id.*)  Psychologist Robert Henry, Ph.D. reviewed the record regarding Healy's mental limitations, affirming the prior mental RFC that limited Healy to "simple/routine tasks with limited social demands." (A.R. 544)

On July 15, 2010, Healy saw Dr. Hohf for followup of her chronic pain.  (A.R. 583)  Dr. Hohf noted the following:

> [Healy] was last seen on 06/23 shortly following her consultation at the OHSU Pain Clinic with Dr. Kaplan.  I initiated the suggestion of a trial of MS Contin.  She took this, but reported nausea, and stomach pain, enough to double her over.  She was then admitted to PPMC Psychiatry on 06/28 with suicidal ideation.  Morphine was withheld.  She received some counseling and her psychiatric meds were adjusted.  She returned to using her oxycodone for pain relief, but was not able to keep within her monthly supply of 20 tablets.  She returned to Dr. Kaplan who saw her again on 07/08.  Her advice was to institute a trial of oxycontin, and titrate so that breakthrough is minimal or absent.  She also suggested a trial of gabapentin for adjunctive treatment.

> [Healy] has been following through with counseling and visits with her psychiatrist, Dr. Parsons.  She thinks that she is receiving good care for her mental health issues.

(*Id.*)  Dr. Hohf made a notation on Healy's chart that she is allergic to morphine, "due to the adverse effects." (*Id.*)  He started Healy on oxycontin 10 mg. every twelve hours; renewed her prescription for oxycodone, 20 pills per month; and directed her to

35 - FINDINGS & RECOMMENDATIONS

return for followup in two weeks.  He did not start the gabapentin, believing the new drugs "should be started stepwise so that if there are side effects it will be easier to sort them out." (*Id.*) Regarding Healy's ulcerative colitis, Dr. Hohf reviewed Dr. Koval's notes, which indicated Healy's "colitis has been mild to moderate at most, and confined to the distal colon." (*Id.*)  Dr. Koval indicated Healy might be having side effects from the Remicade, and he recommended she consider trying another anti-TNF drug.  In addition, Dr. Koval opined Healy would not be a likely candidate for colectomy.  Dr. Hohf communicated that opinion to Healy, and "[s]he was upset with this, as she is quite focused on colectomy as the answer to many or all of her medical issues." (*Id.*)  She had a consult scheduled in the near future with GI surgeon Dr. Kim Lu, and Dr. Hohf encouraged her to pursue that.  He also advised Healy it was "mandatory that she continue under the care of a gastro-enterologist." (*Id.*)

On July 20, 2010, Kim Lu, M.D. wrote to Dr. Hohf regarding his consultative examination of Healy.  Dr. Lu indicated that, "[w]ithout clear inflammatory bowel disease, [Healy] would not benefit from colectomy." (A.R. 577; *see* A.R. 666-71)

On July 28, 2010, Healy saw Dr. Hohf for followup of her chronic pain.  Healy had been on oxycontin since July 15, 2010. She reported the drug had not relieved all of her fibromyalgia-type symptoms, but had been very helpful in relieving a burning pain she had experienced following her most recent Remicade infusion.  Healy was attending school and functioning adequately in her daily life. She was using oxycodone for breakthrough pain, taking one pill per day or less, with none in the last three to four days.  She was not

36 - FINDINGS & RECOMMENDATIONS

1  experiencing increased constipation, daytime sedation, or other
2  side effects from the opioids.  (A.R. 576)

3      Healy saw Dr. Taylor for followup of her ulcerative colitis on
4  August 20, 2010.  Her last visit with Dr. Taylor had been nearly a
5  year earlier, in September 2009.  Notes indicate Healy had a normal
6  colonoscopy in December 2009, and she had missed followup visits in
7  March and July 2010.  (A.R. 569)  Healy continued to complain of GI
8  symptoms, including "bloating, abdominal pain across the epigastric
9  and peri-umbilical area with radiation to the pelvis," and
10  irregular bowel movements.  (*Id.*)  She described side effects from
11  the Remicade infusions, including muscle pain lasting several
12  weeks.  (A.R. 569-70)  Dr. Taylor continued to believe colectomy
13  was not an appropriate treatment measure for Healy's complex symp-
14  toms, although Healy continued to pursue colectomy.  Dr. Taylor
15  expressed concern that Healy's ongoing use of opioids for her
16  chronic pain syndrome was raising "the possibility of evolving GI
17  dysmotility."  (A.R. 573)  He noted Healy was complaining of
18  symptoms that could reflect "slow gastric emptying or evolving
19  opioid bowel."  (*Id.*)  He cautioned against raising her opioid
20  dosage, and although he deferred to Healy's pain specialist and
21  psychiatrist, he recommended non-opioid methods of pain control.
22  (*Id.*)  He scheduled Healy for a colonoscopy "with repeat mucosal
23  biopsy to rule out ongoing active colitis."  (*Id.*)

24      Dr. Taylor wrote to Healy on August 24, 2010, to inform her
25  that her lab results showed "no sign of active inflammation," and
26  her "blood count, liver function tests and renal function all
27  [were] within normal limits."  (A.R. 574)

28

37 - FINDINGS & RECOMMENDATIONS

1    On August 27, 2010, Healy saw Dr. Hohf for followup of her
2    chronic pain and ulcerative colitis.    Healy was "happy with her
3    pain control," and seemed to be "functioning better in her life
4    since the last visit."    (A.R. 566)    She had taken a couple of
5    college courses during the summer, achieving good grades, and
6    planned to continue school in the fall.    She had started taking
7    yoga classes, and stated it was helping her with pain control.    She
8    continued to take oxycontin regularly, and used short-acting
9    oxycodone for breakthrough pain.    Healy was scheduled for a
10   colonoscopy and biopsies with Dr. Taylor.    She stated she had
11   applied for the Compassionate Use Program to receive Humira, hoping
12   she could transition to the drug from Remicade, and have fewer side
13   effects.    Dr. Hohf encouraged Healy "to taper down off the
14   oxycodone when possible, with a goal towards getting completely off
15   that drug."    (*Id.*)    He also echoed Dr. Taylor's concerns about GI
16   side effects from the opiates, and indicated Healy should aim for
17   complete cessation of all opiates.    (*Id.*)

18      Healy underwent a colonoscopy on September 30, 2010.    The
19   colonoscopy, and rectal biopsies, were normal.    (A.R. 561-64)

20      Healy underwent another colonoscopy on November 22, 2010.    The
21   colonoscopy, and biopsies throughout her colon and part of her
22   small bowel, all were completely normal.    (A.R. 560, 662)

23      Healy saw Dr. Parsons for followup on November 23, 2010.    She
24   was feeling better, and felt her new therapist had been very
25   helpful.    She was sleeping better and was less anxious since
26   starting on Seroquel.    Her current psychiatric medications were
27   Cymbalta 90 mg. daily; Seroquel 100 mg., one-half to one tablet at
28   bedtime; and lorazepam 1 mg. three times daily.    (A.R. 764)    Healy

38 - FINDINGS & RECOMMENDATIONS

returned to see Dr. Parsons on December 30, 2010.  She had been having occasional suicidal thoughts, which Healy stated scared her husband.  Healy was preparing to start the DBT group, and she was still seeing her therapist regularly.  Her medications were continued without change.  (*Id.*)

On January 6, 2011, Healy was seen at a hospital with a diagnosis of major depression - recurring - severe.  The record only contains the admission form, with no notes regarding Healy's course of treatment.  (A.R. 774)

On January 10, 2011, Healy saw Dr. Hohf for followup of chronic pain and fibromyalgia.  Notes indicate Healy had been hospitalized in June 2010, after which Healy began seeing a psychiatrist and counselor regularly.  Healy felt she was benefitting from the DBT therapy, which was helping her set goals to improve her life.  The behavioral techniques also were helping her pain, and she was practicing yoga.  She wanted to discuss her pain program.  She was taking about 20 oxycodone per month, and she used medical marijuana for pain and nausea.  She had stopped receiving Remicade infusions, which had resulted in some improvement in her pain.  The doctor noted Healy's ongoing pain was "largely related to her fibromyalgia."  (A.R. 559)[13]  He and Healy agreed the opiates probably were no longer benefitting her much, and she agreed to a plan to taper off the opiates.  He noted the medical marijuana could "help mitigate her symptoms," and he had "no objection to her using that."  (*Id.*)

---

[13]There is nothing in the record to indicate a diagnostic work up of Healy for fibromyalgia with a trigger point analysis.

39 - FINDINGS & RECOMMENDATIONS

1   On January 27, 2011, Healy saw Dr. Parsons for followup.  She
2   was doing much better, and her mood was improved.  She continued to
3   attend the DBT group and see her therapist regularly.  Her
4   medications were continued without change.  (A.R. 764-65)  Healy
5   saw Dr. Parsons on March 2, 2011.  Despite some marital and
6   extended-family difficulties, Healy's mood had been stable, and she
7   was having fewer suicidal thoughts.  (A.R. 765)

8   Healy saw Dr. Parsons again on April 7, 2011.  The doctor
9   noted Healy had "not been able to work consistently for some time
10  and has applied for disability.  She not only has unstable depres-
11  sion and borderline personality disorder, but she also suffers from
12  ulcerative colitis." (*Id.*)  Healy was "fully engaged" in the DBT
13  group, and continued to see a therapist regularly.  Her mood had
14  been more stable, and she denied current suicidal thoughts.  Her
15  medications were continued without change.  (*Id.*)

16  On April 14, 2011, Healy returned to see Dr. Taylor for a
17  flare of her ulcerative colitis.  Healy indicated she had been
18  seeing a psychiatrist, and had made "much progress in her general
19  sense of well-being."  (A.R. 555)  She recently had "suffered a
20  flare of diarrhea, [and] blood in stool with starting a new job."
21  (*Id.*)  Healy stated she had stopped Remicade therapy around
22  September 2010, due to side effects of the drug, and she had not
23  required any medications for ulcerative colitis since that time.
24  She had experienced a flare of her colitis symptoms, along with
25  some cold symptoms in January 2011, and the current flare followed
26  two days of cold symptoms. (*Id.*)  Dr. Taylor indicated it was "rea-
27  sonable to approach this as a flare of colitis," but noted Healy
28  had "expressed similar symptoms in the past with complete absence

of mucosal disease." (A.R. 558)  He noted Healy's last colonoscopy was in August 2010, and he indicated if Healy's symptoms did not improve in one week, he would consider another colonoscopy and stool studies.  (*Id.*)

On June 2, 2011, Healy saw Dr. Parsons for followup.  She stated she had "been struggling." (A.R. 765)  She was depressed, having "passive suicidal thoughts," and was involved in family disagreements.  In addition, her chronic pain was worse.  She was continuing to attend the DBT group.  (*Id.*)

On June 17, 2011, clinical psychologist Cynthia Parker, Ph.D. wrote a report indicating she had been treating Healy since June 14, 2010, for "Major Depressive Disorder (MDD), recurrent severe, without psychotic features and Borderline Personality Disorder (BPD)." (A.R. 545)  Dr. Parker indicated Healy's "current level of functioning is severely impaired by symptoms of her mental illness," and she recommended that, due to Healy's "ongoing illness[,] it is not recommended that she work in any capacity." (*Id.*)  The doctor listed Healy's current symptoms as "Recurrent suicidal threats, gestures and self harm behaviors"; "Impulsivity"; "Affective instability due to a marked reactivity of mood – intense emotional outbursts"; "Persistently unstable self image or sense of self.  Chronic feelings of emptiness"; and "Frantic efforts to avoid real or imagined abandonment." (*Id.*)  Dr. Parker wrote, "I can state, without question, that [Healy] has significant impairments due to her Mental Illnesses." (*Id.*)  She indicated Healy's participation in the DBT program had helped her avoid "hospitalizations due to symptoms of both MDD and BPD as [Healy] is

1 learning alternative coping behaviors to manage her symptoms."
2 (*Id.*)

3     Dr. Taylor wrote to Healy on June 27, 2011, to inform her that
4 biopsies confirmed his colonoscopy findings. He indicated Healy's
5 "colitis is mild and limited to the rectum." (A.R. 554, 693) He
6 advised Healy to "remain on Asacol 800mg 3x/day and a nightly
7 Rowasa (mesalmine) enema," and return for followup in a few weeks.
8 (*Id.*)

9     On July 6, 2011, a multi-disciplinary team reviewed Healy's
10 progress in the DBT program, in which she had been participating
11 for a year. The team recommended Healy continue with weekly group
12 and individual psychotherapy sessions. (A.R. 793; *see* A.R. 795-
13 892, DBT program treatment notes from 6/16/2010 through 10/18/2011)

14     Healy saw Dr. Taylor for followup on July 22, 2011. She was
15 tolerating Rowasa and Asacol well, and was having only mild
16 abdominal cramping. The doctor noted Healy was "working on
17 accepting the fact that she will always have [chronic ulcerative
18 colitis]." (A.R. 689)

19     Dr. Taylor wrote to Healy on July 25, 2011, informing her that
20 her liver panel, kidney function, blood counts, and pancreas
21 enzymes, all were normal. (A.R. 553, 688)

22     Healy returned to see Dr. Parsons on October 13, 2011. Since
23 last seeing him in June 2011, she had been "somewhat more stable."
24 (A.R. 765) She had been off benzodiazepines for two months,
25 instead managing her anxiety with behavioral techniques learned in
26 her DBT group. Her pain management had been better, and she and
27 her husband were getting along well. Notes indicate Healy had

28

42 - FINDINGS & RECOMMENDATIONS

"applied for disability," and had "not been capable of working full time for several years now." (*Id.*)

On October 21, 2011, Dr. Parker wrote another opinion letter regarding Healy's condition and prognosis.  The doctor indicated she had been treating Healy since August 2010[14], and Dr. Parsons had been treating Healy since her initial diagnosis of major depressive disorder, in October 2006.  "In August 2007, Dr. Parsons also added borderline personality disorder and PTSD to Ms. Healy's diagnoses." (A.R. 962)  Dr. Parker noted Healy "has struggled with suicidal ideation, depression and the symptoms of her borderline personality disorder." (*Id.*)  Dr. Parker opined that Healy meets or equals the requirements of Listing 12.08, Personality Disorders.  She gave specific examples of the "paragraph A" criteria of the Listing, explaining how Healy meets each of those criteria.  According to Dr. Parker, Healy exhibits seclusiveness; pathologically inappropriate suspiciousness or hostility; oddities of thought, perception, speech, and behavior; persistent disturbances of mood or affect; pathological dependence, passivity, or aggressivity; and intense and unstable interpersonal relationships, and impulsive and damaging behavior.  In addition, Dr. Parker opined Healy satisfies the "paragraph B" criteria of the Listing based on Healy's marked restriction of her activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace.  She also indi- cated Healy has had repeated episodes of decompensation, each of

---

[14]In Dr. Parker's letter of June 17, 2011, she indicated she had been treated Healy since June 14, 2010.  (A.R. 545)

43 - FINDINGS & RECOMMENDATIONS

1  extended duration.  Dr. Parker opined Healy would miss two to five

2  days or work per month due to her symptoms.  (A.R. 962-64)

3       On December 8, 2011, Dr. Parker wrote a note indicating Healy

4  continued to be limited by her impairments as indicated in the

5  doctor's October 21, 2011, letter, despite Healy's "compliance with

6  her prescribed treatment and significant effort in her DBT

7  program."  (A.R. 968)

8

9                    ***B.  Healy's Testimony***

10      Healy was thirty years old at the time of the ALJ hearing.

11 She is a college graduate, having earned a B.A. in Psychology.

12 (A.R. 42-43)  She met her husband in September 2008, and they were

13 married in March 2010. (A.R. 61)

14      Healy initially started college on an ROTC scholarship.  Then

15 she began developing symptoms of ulcerative colitis, having to go

16 to the bathroom urgently and unexpectedly.  According to Healy, she

17 "lost 30 pounds in a few months."  (A.R. 56)  It took several

18 months for Healy to finally obtain a diagnosis of her condition,

19 during which time she dropped all of her classes, and was on a

20 leave of absence from the ROTC program.  After she received her

21 diagnosis, she informed the ROTC program, and she was "disquali-

22 fied" and lost her scholarship.  (A.R. 56-57)

23      In 2007, Healy began working for a friend who was a family

24 lawyer, and that attorney "taught [her] the ropes" of working as a

25 legal assistant.  (A.R. 52)  Between 2008 and 2010, Healy did temp

26 work as a legal assistant, and really enjoyed the work.  According

27 to Healy, she thrived on being thrown into a new environment where

28 she had to get up-to-speed right away.  (A.R. 51-52)  She also

44 - FINDINGS & RECOMMENDATIONS

1    taught skiing to young children at Mount Hood. (A.R. 47) She
2    explained that she begins having trouble when she is on a job too
3    long. She tends to over-react to comments made by coworkers and
4    clients, responding inappropriately, or even leaving work without
5    explanation. (A.R. 52-54) She has been verbally abusive to
6    coworkers and employers, and has been fired from jobs because of
7    her behavior. (A.R. 54-55) The longest she has ever been able to
8    stay in one job was about eighteen months in 2004-2005, when she
9    worked at a call center for a credit union. (A.R. 55-56)

10        At the time of the ALJ hearing, Healy was working 24 hours a
11   week for a company that contracts with mortuaries to transport the
12   remains of decedents to the morgue, funeral homes, or a crematory.
13   Healy typically worked the swing shift from 3:30 to 11:30 p.m. She
14   was paid $9.00 per hour at the job. Healy indicated her employer
15   provided her with "some amazing accommodations," including allowing
16   her to leave immediately if she became upset about something, and
17   providing "sort of an open forum" for employees to talk about their
18   feelings if they went out on a difficult call. (A.R. 44-48) She
19   stated although the job could be stressful at times, she had plenty
20   of time to decompress between calls. She was free to use the
21   restroom as needed, and she had been able to make the job work for
22   her. (A.R. 48, 58) Besides going out on calls to pick up remains,
23   Healy's duties also included asking questions for the death
24   certificate, filling out paperwork, and interacting with family
25   members of the deceased, providing empathy and support. (A.R. 49)

26        When asked why she would be unable to work at this job full
27   time, Healy responded that after working two days in a row, she
28   needs a day off "to use the restroom all the time," and care for

45 - FINDINGS & RECOMMENDATIONS

1   her "digestive issues." (A.R. 50)  In addition, Healy stated she
2   has tested herself to see if she could work more hours, but it
3   results in her "acting out." (*Id.*)

4       Healy believes her digestive problems and her mental problems
5   are interrelated.  Her digestive symptoms worsen when she is under
6   stress, and flares of her ulcerative colitis cause more stress.
7   (A.R. 56-57)

8       Healy stated she has frequent thoughts of suicide, including
9   fantasizing about how she would do it.  She sees a therapist,
10  Dr. Cynthia Parker, for an hour once a week, and also attends a
11  one-hour DBT group once a week.  She has been in the DBT group
12  since August 2010.  When she has a panic attack or is feeling
13  suicidal, she can call a 24-hour help line for people in her DBT
14  group.  She also sees her psychiatrist for an hour once each month.
15  All of these appointments take place during the day, and Healy
16  considers these sessions to be critical to her ability to function.
17  (A.R. 59-60, 63)  She stated the DBT group has helped her learn
18  coping skills for her depression and anxiety, and has helped her
19  stop self-harming behaviors such as pulling out her hair and not
20  eating.  (A.R. 63-64)  Her marriage also has been stabilizing for
21  her, as her husband and his family are supportive, and are "models"
22  of the type of person Healy aspires to be.  (A.R. 65)

23      Healy has few friends.  She has lost close friends in the past
24  because she would express her suicidal thoughts, or behave
25  inappropriately.  She stated she has not always been "a good friend
26  or a good person that you want to be around." (A.R. 61)

27      Healy stated she drinks about one glass of wine per month.
28  She used to drink a lot more, but she curtailed most of her

46 - FINDINGS & RECOMMENDATIONS

1  drinking about three years prior to the ALJ hearing.  She has a
2  medical marijuana card, and smokes marijuana daily.  According to
3  Healy, smoking marijuana has allowed her to stop taking Oxycontin
4  and other medications with side effects.  She stated the marijuana
5  makes her feel "normal."  (A.R. 62-63)

6  Healy volunteers at Our House, a residential community for
7  people living with HIV/AIDS.  She works at Our House about three
8  times a month, for four hours each time, answering the phones.
9  (A.R. 65)  She used to work as a victim's advocate at the Sexual
10 Assault Resource Center.  She left that position in an attempt "to
11 shy away from the stark and . . . explore different things."  (A.R.
12 66)

13 The ALJ indicated he has seen a lot of people with borderline
14 personality disorder in his sixteen years on the bench, and he
15 observed that Healy has a great deal more insight into her
16 condition than most of those other claimants.  Healy stated her
17 education and experience, coupled with what she has learned in the
18 DBT group, have helped her a great deal.  She stated she hopes her
19 disability will not be permanent.  At the moment, she believes she
20 needs to continue her individual therapy and her participation in
21 the DBT group.  She believes that once her mental condition becomes
22 more stabile, her ulcerative colitis symptoms also will improve.
23 She estimated it would be two to three more years before she could
24 return to full-time work.  (A.R. 67-68)

25

26                    *C.  Third-Party Testimony*

27 Healy's husband Michael testified he has known Healy since
28 September 2008.  He has seen her almost daily from the time they

47 - FINDINGS & RECOMMENDATIONS

met.  Michael indicated the nature and quality of his relationship
with Healy will fluctuate depending on how Healy is feeling about
herself, and how she is getting along with her family.  At times,
they interact in a healthy manner, while at other times, they butt
heads, and Healy "secludes herself completely away from [him]."
(A.R. 71)  He stated Healy isolates herself "in small bursts," for
some portion of every day.  According to Michael, Healy sometimes
stays in bed all day for several days in a row, depending on what's
going on.  He stated her moods can change from happiness to despair
to "rageful anger" and back again, all depending on what's going on
around her, and how she is reacting to it emotionally.  Michael
stated he has sought therapy, himself, at times to help himself
learn how to deal with Healy's mood swings and her complex
emotions.  (A.R. 72)

Michael stated that from the time he has known Healy, she has
never worked anywhere for more than a couple of months at a time,
20 to 30 hours per week, "[e]ven though she's really tried to."
(A.R. 73)  According to him, Healy's "triggers" can evoke emotional
responses without regard to the setting (work, home, etc.), and he
believes it is a daily challenge for Healy, knowing she may have an
uncontrollable emotional response "in a professional setting with
people who don't understand what she's going through."  (*Id.*)  He
stated, "The challenge is even just getting herself up and out of
bed and out the door when this is a very real kind of scary
possibility, day in and day out.  Whatever she's doing."  (*Id.*)

Michael stated that from his observation, Healy is able to
focus intensely on a task for only short periods of time, and then
her mind is off "onto the next thing."  (A.R. 74)  He has not

48 - FINDINGS & RECOMMENDATIONS

observed Healy at work, but at home, he has seen her focus on a task briefly, and "as soon as that timer is up – well, if the dishes are halfway done or the laundry is halfway done or – whatever the task is that she's working on, it's done." (*Id.*) According to him, sometimes Healy can focus on a task for two hours, but other times she can only focus for ten minutes. (A.R. 75)

Michael stated Healy tells him about her suicidal thoughts at least once a month. He indicated that during the summer of 2010, he and Healy "got so scared" they called a suicide prevention hotline, with the result that Healy was hospitalized. (A.R. 76) He also described difficulties he has observed in Healy's ability to cope in social situations. He stated Healy has very black-and-white thinking about people, and whether they are "good" or "bad," and on her side or not. According to him, someone can "hit one of those triggers, – kind of unbeknownst to them and not intentionally – and it's like the switch is flipped," causing Healy to conclude the person is "intentionally going after her." (A.R. 76-77) He stated similar things happen to Healy in a work setting. He described one instance where Healy was working with a lifelong friend who ended up triggering an unprofessional reaction from Healy that caused Healy to have to leave the job, and ended the relationship with her friend. (A.R. 77-78)

In Michael's opinion, Healy is unable to work full time because she is unable "to exist in society 100 percent at this time." (A.R. 78)

49 - FINDINGS & RECOMMENDATIONS

1

### D. Vocational Expert's Testimony

2    The VE characterized Healy's past work as follows: (1) Legal

3  assistant, which is classified as sedentary work, skilled, with an

4  SVP of 7,[15] but Healy "[did] not meet the SVP"; (2) Housekeeper,

5  light work, unskilled, with an SVP of 2; (3) Ophthalmic technician,

6  light work, skilled, with an SVP of 6, but Healy "[did] not meet

7  the SVP"; (4) Call-center rep for financial institutions, light

8  work, skilled, with an SVP of 6, and Healy did meet the SVP; (5)

9  Barista, light work, unskilled, with an SVP of 2; (6) two different

10  capacities with a credit union, both classified as sedentary work,

11  skilled, with an SVP of 7, but Healy "[did] not meet the SVP"; (7)

12  Bakery/Café supervisor, medium work, skilled, with an SVP of 8; (8)

13  Retail sales, light work, semi-skilled, with an SVP of 3; (9) Fast-

14  food worker, light work, unskilled, with an SVP of 2; and (10)

15  seasonally, "on and off," as a ski instructor, medium work,

16  skilled, with an SVP of 7, and Healy "[did] not meet the SVP."

17  (A.R. 80-81)

18    The ALJ asked the VE to consider "a hypothetical claimant

19  capable of at least light-level work," but with the following "non-

20  exertional vocational limitations":

21

22

23    [15]Jobs are classified with an "SVP," or level of "specific
     vocational preparation" required to perform the job, according to
     the *Dictionary of Occupational Titles*.  The SVP "is defined as the

24    amount of lapsed time required by a typical worker to learn the
     techniques, acquire the information, and develop the facility

25    needed for average performance in a specific job-worker situation."
     *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or.

26    Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies
     jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of

27    3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as
     skilled."  *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or

28    Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

50 - FINDINGS & RECOMMENDATIONS

1
2
3
4
5

> She should always have ready access to a
> restroom in the workplace.  She should engage
> in no more than occasional public contact.
> She could not sustain skilled work, but could
> sustain unskilled to semi-skilled work.  This
> hypothetical claimant works best alone and not
> as part of a team in the workplace and can
> engage in minimal interaction with coworkers
> and others.

6   (A.R. 81-82)  The VE indicated the only one of Healy's past jobs

7   this hypothetical individual could perform was the housekeeper job.

8   Because the ALJ was unsure whether that job was performed at the

9   substantial gainful activity level, the ALJ asked the VE if there

10  were any other jobs the hypothetical individual could perform,

11  assuming that individual was Healy's age, and had her education and

12  work experience.  The VE indicated the individual would be able to

13  work as "a companion," which is classified as light work, semi-

14  skilled, with an SVP of 3.  The individual also could work as "a

15  food assembler," a light, semi-skilled job, with an SVP of 3.

16  (A.R. 82)

17      The VE further stated that if the hypothetical individual

18  suffered "from attention and concentration deficits that during

19  such occasions would be classified at the marked level," then the

20  individual would be unable to work at any job at the substantial

21  gainful activity level.  (A.R. 83)

22

23      ### III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

24              #### A.  Legal Standards

25      A claimant is disabled if he or she is unable to "engage in

26  any substantial gainful activity by reason of any medically deter-

27  minable physical or mental impairment which . . . has lasted or can

28

51 - FINDINGS & RECOMMENDATIONS

be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula-tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform

52 - FINDINGS & RECOMMENDATIONS

other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id*. at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id*. at 1284.

*Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

### B.  The ALJ's Decision

The ALJ found Healy has not engaged in substantial gainful activity since her alleged disability onset date of July 1, 2007. He found she has severe impairments consisting of "borderline personality disorder; ulcerative colitis; anxiety disorder, NOS; depression disorder, NOS; cannabis dependence, controlled setting;

53 – FINDINGS & RECOMMENDATIONS

[and] alcohol dependence, remission per claimant." (A.R. 22)
However, he further found Healy "does not have an impairment or
combination of impairments that meets or medically equals the
severity of one of the listed impairments[.]" (A.R. 24)

Regarding Healy's mental impairments, the ALJ found Healy has
mild restrictions of the activities of daily living.  He noted
Healy described her daily activities as including "preparing meals,
taking care of two guinea pigs, going to doctor appointments or
running errands, and exercising at the gym." (A.R. 25) Healy also
stated she "cleans the house, washes laundry, and shops in stores
for groceries and cloths [sic]," and "she has no problems per-
forming personal care." (*Id.*)

The ALJ found Healy has moderate difficulties in social
functioning, noting she talks with friends and family daily, "in
person, on the phone, and on the computer," and, per Healy's own
report, "she gets along very well with authority figures and is
respectful with them." (*Id.*) He found Healy also has moderate
difficulties with regard to concentration, persistence, or pace,
noting Healy is able to drive a car, "pay bills, count change,
handle a savings account, and use a checkbook/money order." (*Id.*)

The ALJ further found Healy "has experienced no episodes of
decompensation which have been of extended duration." (*Id.*) After
rating the severity of Healy's mental impairments, the ALJ found
Healy has the residual functional capacity ("RFC") set forth in the
ALJ's hypothetical question to the VE. (*Id.; see* section II.D.,
above)

The VE found Healy's testimony was not fully credible with
regard to the intensity, persistence, and functionally limiting

54 – FINDINGS & RECOMMENDATIONS

effects of her impairments.  He gave the following reasons for this decision:

a)   The ALJ noted that at the hearing, Healy and her attorney "conceded her physical condition is pretty much in remission or at least controlled, and her primary disabling claim is mental and related to her personality disorder." (A.R. 26)  However, the ALJ found Healy's mental impairment does not preclude all work, listing some of Healy's past jobs, and her current part-time job with a mortuary. (A.R. 26-27)

b)   The ALJ found Healy "has frequently not taken her medication as prescribed." (A.R. 27)  He cited two instances - one in November 2007, when Dr. Bowen's treatment notes indicate Healy "stopped taking her prescribed medication for her mental impair-ments" (A.R. 760)[16]; and the other described in a note from the DBT group dated September 3, 2010, when Healy indicated she had taken "her medications 'to get high'." (A.R. 806)

c)   The ALJ noted Healy had "traveled to Alaska in 2008, and worked as a ski instructor for three months"; in 2009, "she won an essay contest and traveled to California for a media contest concerning her ulcerative colitis"; and in June 2010, she was taking classes at Portland State University.  (A.R. 27)

d)   The ALJ noted the record indicates Healy is a daily user of marijuana.  In February 2010, Healy "diagnosed herself as an

---

[16]The court notes this treatment record indicates Healy "went off seroquel because of cost and weight gain."  She was still taking Cymbalta (duloxetine, used to treat major depressive disorder and generalized anxiety disorder), Wellbutrin (bupropion, used to treat depression), and Xanax (alprazolam, used to treat anxiety and panic disorder).  (A.R.  760)

55 - FINDINGS & RECOMMENDATIONS

alcoholic."  And, as noted previously, she reported taking her
medications to "get high" on one occasion.  (A.R. 27; *see* A.R. 521)

e)  Although Healy has not worked at the substantial gainful
activity level since her alleged disability onset date, the ALJ
found "her earnings and work after the alleged onset indicate she
is capable of working, and do not support the severity of her
alleged conditions."  (A.R. 27)

The ALJ further found the medical evidence of record supported
his assessment of Healy's RFC.  He gave less than full weight to
the opinion of DDS consulting psychologist Dr. Stradinger's
regarding Healy's mental functional abilities, finding some of the
doctor's opinions were unsupported by the record.  He gave one
example, noting Dr. Stradinger opined Healy likely could not
perform complex and difficult tasks on a sustained basis, and she
would have some difficulty interacting with others in the work
setting.  The ALJ noted Healy "worked as a ski instructor
throughout 2007-2010, and on one occasion for three months,
indicat[ing] she is capable of working with others and working on
a sustained basis while performing complex and physical tasks."
(A.R. 26-27)

The ALJ similarly gave little weight to the opinions of
Healy's treating psychologist Cynthia Parker, Ph.D.  He found
Healy's "earnings record and her testimony show [Healy] worked
during the period Dr. Parker opined she [was] disabled," and
Healy's "current job as a body transporter for a mortuary indicates
she is capable of performing at a higher level than Dr. Parker
opines."  (A.R. 29)  The ALJ further found the fact that
Dr. Parker's opinion letters were undated detracted from their

56 - FINDINGS & RECOMMENDATIONS

1   evidentiary value, because it was unclear how many DBT sessions
2   Healy had attended before the doctor gave her opinions.  The ALJ
3   also found "Dr. Parker did not take into account [Healy's]
4   abilities if she took her medication as prescribed and put forth a
5   good faith effort in the DBT treatment program." (*Id.*)

6       The ALJ discounted the opinions of counselor Jonnie M.
7   Vanderzanden on the basis that the counselor is not "an acceptable
8   medical source" under the regulations; her opinions are incon-
9   sistent with Healy's daily activities and reported work activities;
10  and her opinions "appear to be based on [Healy's] self reported
11  symptoms, and not based on objective medical evidence." (*Id.*)

12      Regarding Healy's physical RFC, the ALJ gave great weight to
13  the opinion of Dr. Alley, the state consultant who performed a
14  paper review of Healy's medical records.  Regarding Healy's mental
15  RFC, the ALJ gave "some weight" to the opinions of consultant Megan
16  Nicoloff, Psy.D, but discounted that doctor's opinion that Healy
17  should avoid work around dangerous machinery and heights because
18  Healy's work as a ski instructor would have required her to work
19  around ski lifts.  The ALJ accepted Dr. Nicoloff's other conclu-
20  sions regarding Healy's mental RFC. (A.R. 28)

21      The ALJ found the testimony of Healy's husband, and a
22  functional report completed by Healy's mother, were inconsistent
23  with Healy's claim that she is incapable of all work. (A.R. 29)

24      The ALJ concluded the evidence as a whole is inconsistent with
25  Healy's claim that she is unable to perform any type of work.
26  Based on the VE's testimony, which relied on the ALJ's RFC
27  assessment, the ALJ found Healy is capable of returning to her past
28  work as a housekeeper, and she also could work as a companion, or

57 - FINDINGS & RECOMMENDATIONS

a food assembler.  Accordingly, the ALJ found Healy not disabled
from July 1, 2007, through the date of his decision.  (A.R. 30-31)

### IV.   STANDARD OF REVIEW

The court may set aside a denial of benefits only if the
Commissioner's findings are "'not supported by substantial evidence
or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.
Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.
Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black
v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
(9th Cir. May 20, 2011).  Substantial evidence is '"more than a
mere scintilla but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply
by isolating a specific quantum of supporting evidence.'"  *Holohan
v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett
v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
must consider the entire record, weighing both the evidence that
supports the Commissioner's conclusions, and the evidence that
detracts from those conclusions.  *Id.*  However, if the evidence as
a whole can support more than one rational interpretation, the
ALJ's decision must be upheld; the court may not substitute its
judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.
Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

58 - FINDINGS & RECOMMENDATIONS

1

*V.  DISCUSSION*

2       Healy argues the ALJ erred in (1) rejecting the opinions of

3  Healy's treating psychologist Dr. Parker, "without providing 'clear

4  and convincing' or 'specific and legitimate' reasons for doing so";

5  (2) rejecting the testimony of Healy's husband "without providing

6  'germane' reasons for doing so"; and (3) finding Healy's testimony

7  less than fully credible "without providing 'specific, clear and

8  convincing' reasons for doing so."  Dkt. #12, p. 2.

9

10       *A.  Weight Given to Dr. Parker's Opinion*

11       The law regarding the weight to be given to the opinions of

12  treating physicians is well established.   Generally, "[t]he

13  opinions of treating physicians are given greater weight than those

14  of examining but non-treating physicians or physicians who only

15  review the record."  *Benton ex rel. Benton v. Barnhart*, 331 F.3d

16  1030, 1036 (9th Cir. 2003).  The *Benton* court quoted with approval

17  from *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the

18  court held as follows:

19              As a general rule, more weight should be given
                to the opinion of a treating source than to
20              the opinion of doctors who do not treat the
                claimant.   At least where the treating doc-
21              tor's opinion is not contradicted by another
                doctor, it may be rejected only for "clear and
22              convincing" reasons.   We have also held that
                "clear and convincing" reasons are required to
23              reject the treating doctor's ultimate conclu-
                sions.   Even if the treating doctor's opinion
24              is contradicted by another doctor, the Commis-
                sioner may not reject this opinion without
25              providing "specific and legitimate reasons"
                supported by substantial evidence in the
26              record for so doing.

27  *Id.* (quoting *Lester, supra*).

28

59 – FINDINGS & RECOMMENDATIONS

1    The ALJ may disregard a treating physician's opinions that are
2    "conclusory, brief, and unsupported by the record as a whole, . . .
3    or by objective medical findings." *Id.* (citing *Matney, supra*;
4    *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).  An ALJ
5    may not reject a treating doctor's opinion without providing "spe-
6    cific and legitimate reasons' supported by substantial evidence in
7    the record. . . .  This can be done by setting out a detailed and
8    thorough summary of the facts and conflicting clinical evidence,
9    stating [the ALJ's] interpretation thereof, and making findings."
10   *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (citations
11   omitted).  The *Orn* court further held, "The ALJ must do more than
12   offer his conclusions.  He must set forth his own interpretations
13   and explain why they, rather than the doctors', are correct." *Id.*
14   (citation omitted).

15       Here, the ALJ offered three grounds for rejecting Dr. Parker's
16   opinions.  First, the ALJ found Healy's "current job as a body
17   transporter for a mortuary indicates she is capable of performing
18   at a higher level than Dr. Parker opines." (A.R. 29)  The
19   Commissioner views this as the most significant of the ALJ's
20   reasons for rejecting Dr. Parker's opinions. Dkt. #13, p. 6.

21       Healy testified that she works three days per week for a total
22   of twenty-four hours.  Her job involves short bursts of high-stress
23   activity, interspersed with long periods of more relaxed activity
24   when she helps family members of a decedent fill out paperwork, and
25   she can get something to eat or use the restroom.  Healy stated she
26   receives "some amazing accommodations" on her job.  The Commis-
27   sioner argues Healy only mentioned one specific accommodation;
28   i.e., "freedom to use the restroom when needed." Dkt. #13, p. 8.

60 - FINDINGS & RECOMMENDATIONS

The record contradicts this assertion.  Healy testified her accom-
modations consist of: (1) the freedom to use the restroom whenever
needed; (2) the freedom to leave work immediately if she becomes
upset about something, even if she is out on a call at the time;
(3) a work atmosphere that provides "sort of an open forum" for
employees to talk about their feelings if they go out on a
difficult call; (4) plenty of time to decompress between calls; and
(5) the freedom to miss work when she has a flare-up of her
symptoms.  (A.R. 44-48, 58)  In addition, she does not work more
than two days in a row before she has a day off to decompress and
deal with her ongoing digestive issues.  These accommodations are
consistent with Dr. Parker's opinion that Healy is "unable to
concentrate, stick with a task, or keep up the required pace," when
she becomes "emotionally overwhelmed."  (A.R. 964)  Healy's work
schedule is also consistent with Dr. Parker's opinion that Healy
would miss up to five days of work per month.

    The Commissioner further argues "Dr. Parker's opinion did not
take into account [Healy's] failure to take her medication as
prescribed and fully participate in DBT treatment" - the second of
the ALJ's reasons for discounting the doctor's opinions.  Dkt. #13,
p. 9; *see* A.R. 29.  Although conceding the record contains little
documentation of Healy taking her medications inappropriately, the
Commissioner argues the ALJ was allowed to *infer* that Healy was
noncompliant with her medication regimen due to her marijuana use,
and her past history of alcohol abuse.  The law does not support an
ALJ's authority to make such an inference.  The record evidence
indicates Healy was, in fact, "fully engaged" in the DBT group, and
saw her counselor regularly. (A.R. 765)  The only evidence of Healy

61 - FINDINGS & RECOMMENDATIONS

1  mis-using her medications was a single incident that occurred
2  almost a year prior to Dr. Parker's October 2011 opinion.  Further,
3  the uncontradicted evidence indicates Healy stopped using alcohol
4  in 2008.  (*See* A.R. 521)  The evidence does not support a reason-
5  able inference that Healy was not taking her medications as
6  directed, or failed to participate in her treatment fully.  The
7  court rejects this reason for discounting Dr. Parker's opinion.

8      The Commissioner concedes that the ALJ erred in relying on the
9  lack of dates on Dr. Parker's opinion letters.  Dkt. #13, p. 9.
10  However, the Commissioner argues this error was harmless "because
11  the inconsistency between [Healy's] work activity and Dr. Parker's
12  opinion is more than sufficient to support [t]he ALJ's rejection of
13  this opinion." *Id.*  As just discussed above, the court disagrees
14  with this analysis.

15      Despite Healy's insight into her physical and mental limita-
16  tions, and her obvious intelligence, the record indicates she has
17  been unable to sustain full-time employment since well before her
18  alleged disability onset date.  Healy's treating psychologist has
19  opined that Healy would be unable to sustain full-time employment
20  due to the symptoms of her Borderline Personality Disorder.
21  Dr. Parker offered detailed evidence of how Healy's condition and
22  symptoms meet the Listing requirements.  Dr. Parker's opinions are
23  supported by the state-agency consultant Dr. Stradinger's opinion
24  that Healy "likely would have a difficult time concentrating and
25  sustaining her focus in a job for a long period of time given her
26  personality traits and her depression." (A.R. 524)  The ALJ failed
27  to give "'specific and legitimate reasons' supported by substantial
28  evidence in the record" for rejecting Dr. Parker's opinion.

62 - FINDINGS & RECOMMENDATIONS

1    The Ninth Circuit Court of Appeals has held that when an ALJ
2    improperly rejects controlling evidence, the record is fully
3    developed, and "it is clear from the record that the ALJ would be
4    required to find the claimant disabled were [the improperly-
5    rejected] evidence credited," the court should credit the rejected
6    evidence and remand the case for an immediate award of benefits.
7    *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citations
8    omitted).[17]

9    Here, the Commissioner argues remand for further proceedings
10   is appropriate because of Healy's "drug addiction or alcoholism."
11   Dkt. #13, p. 15.  The Commissioner argues "further proceedings are
12   necessary to evaluate the materiality of [Healy's] daily marijuana
13   use before she can establish that she is eligible for disability
14   benefits."  *Id.*  On this point, the court agrees with the Commis-
15   sioner.  In Dr. Parker's opinion, she indicated Healy suffers from
16   symptoms including, among others, "limited stamina and resilience,"
17   and "inappropriate suspiciousness or hostility."  (A.R. 963-64)
18   However, Dr. Parker failed to address the effects of Healy's daily
19   marijuana use on Healy's symptoms, her ability to engage and par-
20   ticipate fully in her treatment, and her prognosis.  As a result,
21   remand is necessary for the ALJ to determine which of Healy's
22   disabling limitations would remain if Healy stopped using
23   marijuana; i.e., a determination of whether Healy's addiction to
24   marijuana is "a contributing factor material to [her] disability."

25

26

27   [17]The court notes the Commissioner has reasserted her "long-
     standing opposition to the Ninth Circuit's credit-as-true rule,"
     thus preserving the issue for purposes of any appeal.  Dkt. #13,
28   p. 15.

63 - FINDINGS & RECOMMENDATIONS

*Parra v. Astrue*, 481 F.3d 742, 746-47 (9th Cir. 2007) (citing, *inter alia*, 20 C.F.R. § 404.1535(b)).

### B.  Weight Given to Michael Healy's Testimony

Healy argues the ALJ erroneously rejected her husband Michael's testimony without providing "germane" reasons for doing so.  Although an ALJ has a duty to consider lay witness testimony, such testimony may be discounted if the ALJ gives reasons germane to the witness.  *See, e.g.*, *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009).  The ALJ indicated he had "considered Mr. Healy's testimony in the residual functional capacity. . . .  I have also considered [Healy's] substantial activities and work history and the entire medical record.  This evidence does not support a finding [that Healy] is incapable of all work." (A.R. 29)

Although the ALJ indicated he had "considered" Michael's testimony in formulating Healy's RFC, the ALJ did not include in the RFC all of the limitations Michael described, nor did the ALJ explain his failure to do so.  Michael's description of Healy's volatile emotional state, and inability to maintain concentration for extended periods, was consistent with Dr. Parker's description of Healy's ongoing symptoms.  The court finds the ALJ failed to give germane reasons for failing to credit Michael's testimony.  On remand, the ALJ should be directed to reevaluate Michael Healy's testimony regarding his wife's symptoms, abilities, and limita-tions, and to provide appropriate reasons for any of the testimony he ultimately rejects.

*C. Credibility Determination*

Healy argues the ALJ erred in rejecting her testimony without providing "specific, clear and convincing" reasons for doing so, as required by *Batson* and its progeny. *See Batson*, 359 F.3d at 1196. In other words, Healy argues the ALJ erred in finding her testimony less than fully credible.

As summarized above, the ALJ gave several reasons for rejecting Healy's testimony concerning the intensity, persistence, and limiting effects of her impairments. The problem with the ALJ's analysis is that few of his reasons for discounting Healy's testimony are supported by substantial evidence. As discussed above in connection with the weight give Dr. Parker's opinion, the ALJ erroneously relied on Healy's sporadic work history and current job duties in finding her mental impairment does not preclude all work. The ALJ also relied on his conclusion that Healy "has fre-quently not taken her medication as prescribed" (A.R. 27), a conclusion belied by the evidence of record.[18]   Although the ALJ noted the evidence indicates Healy is a daily marijuana user, he failed to identify how this fact detracts from Healy's testimony regarding her limitations.

The court finds the ALJ's credibility analysis is flawed because he failed to provide "specific, clear and convincing" reasons for rejecting Healy's subjective complaints.   On remand, the ALJ should be directed to reevaluate Healy's testimony, and to

---

[18]Also contradicted by the record evidence is the ALJ's conclusion that Healy "has experienced no episodes of decompensa-tion which have been of extended duration." (A.R. 25)

65 - FINDINGS & RECOMMENDATIONS

provide appropriate reasons for any of her testimony that he rejects.

### VI.   CONCLUSION

For the reasons discussed above, the undersigned recommends the Commissioner's decision be reversed, and the case be remanded with instructions for the ALJ to credit the opinions of Dr. Parker, and reevaluate the testimony of Healy and her husband.  If this results in a finding of "disabled" under the five-step inquiry, the ALJ will be required to determine whether Healy's marijuana addiction is a contributing factor material to her disability. *See Parra*, 481 F.3d at 746-47

### VII.   SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **January 5, 2015**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **January 22, 2015**.  By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this  11th  day of December, 2014.


/s/ Dennis J. Hubel

_____
Dennis James Hubel
Unites States Magistrate Judge

66 - FINDINGS & RECOMMENDATIONS